Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/14/2023 09:06 AM CDT

State of Nebraska, appellee, v.
Lindsay M. Johnson, appellant.

___ N.W.2d ___

Filed April 14, 2023.    No. S-22-460.

1. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.

2. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.

3. **Trial: Witnesses.** It is for the trial court to determine the extent to which a sequestration order will be applied in a given case.

4. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

5. **Sentences: Judges: Words and Phrases: Appeal and Error.** A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

6. **Preliminary Hearings: Plea in Abatement.** The proper method of objecting to trial in the district court for the insufficiency of a preliminary hearing, or the failure to provide one at all, is by motion to quash or a plea in abatement.

7. **Preliminary Hearings: Plea in Abatement: Evidence: Appeal and Error.** Any error by the trial court in overruling a defendant's plea in abatement alleging there was insufficient evidence presented at a

preliminary hearing to bind the case over for trial is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported by sufficient evidence.

8. **Preliminary Hearings: Convictions: Evidence.** A failure to hold a preliminary hearing is cured by a subsequent conviction supported by sufficient evidence that the defendant is guilty beyond a reasonable doubt.

9. **Preliminary Hearings: Convictions: Evidence: Probable Cause.** If the trier of fact, upon sufficient evidence, has found the defendant guilty of the charged crime beyond a reasonable doubt, the defendant cannot show prejudice resulting from trial counsel's failure to object to the lack of evidence supporting probable cause at a preliminary hearing, or to object to the failure to hold a preliminary hearing at all.

10. **Effectiveness of Counsel: Records: Appeal and Error.** The record is sufficient to review the merits of the ineffective performance claims if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

11. **Trial: Witnesses.** Sequestration is based on the belief that not hearing other witnesses' testimony tends to better elicit the truth and promote the ends of justice.

12. **Trial: Waiver: Appeal and Error.** A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal.

13. **Appeal and Error.** An appellate court will not consider an argument or theory that is raised for the first time on appeal.

14. ____. When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

15. **Self-Defense: Jury Instructions.** Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense.

16. **Self-Defense: Jury Instructions: Evidence.** If the trial evidence does not support a claim of self-defense, the jury should not be instructed on it.

17. **Self-Defense.** To successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances.

18. **Self-Defense: Jury Instructions: Evidence.** To instruct on self-defense, it is not enough that the defendant subjectively believed in the need

to use force for self-protection; the defendant must produce evidence that this subjective belief was also objectively reasonable.

19. **Sentences.** The sentencing court is not limited to any mathematically applied set of factors.

20. \_\_\_\_. The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

21. **Sentences: Verdicts: Evidence: Presentence Reports.** So long as it does not concern a fact exposing the defendant to a greater punishment than that authorized by the jury's guilty verdict, it is not improper for a sentencing judge to make factual findings for purposes of sentencing relating to the circumstances of the crime and which are supported by the evidence at trial, the presentence investigation report, or evidence submitted at the sentencing hearing.

22. **Sentences.** In a sentencing hearing, the court generally has broad discretion concerning the scope and type of information to be considered.

Appeal from the District Court for Madison County: James G. Kube, Judge. Affirmed.

Timothy S. Noerrlinger, of Naylor & Rappl Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

The defendant appeals her conviction and sentence on one count of assault in the second degree and one count of negligent child abuse. Represented by new counsel, the defendant asserts trial counsel was ineffective by failing to move to quash the second count of the operative complaint, because no preliminary hearing was held in district court to determine probable cause and no plea was entered on that charge. She

also asserts trial counsel was ineffective by failing to ask more questions during voir dire about two jurors' relationships with one of the State's witnesses. The defendant argues the trial court erred by excepting from its sequestration order an eyewitness to the crimes who was the wife of one victim and mother of the other. She also asserts the court erred by refusing to give a self-defense instruction. Finally, she argues the court imposed excessive sentences by giving her jail time rather than probation. We affirm.

## II. BACKGROUND

Lindsay M. Johnson was found guilty following a jury trial of assault in the second degree and of negligent child abuse. She was originally charged on July 15, 2020, with one count, assault in the second degree, in violation of Neb. Rev. Stat. § 28-309(1)(a) and (b) (Reissue 2016), a Class IIA felony. Johnson waived appearance at the arraignment hearing, but did not waive the preliminary hearing, which was held, and she entered a plea of not guilty. On March 18, 2021, the State filed an amended information setting forth the same charges.

### 1. COUNT II

On June 1, 2021, the State filed another amended information, this time setting forth two counts. Count I charged assault in the second degree, in violation of § 28-309(1)(a) and (b), a Class IIA felony. Count II charged intentional child abuse, in violation of Neb. Rev. Stat. § 28-707(1)(a) through (f) (Cum. Supp. 2022), a Class IIIA felony. The State confirmed that count II was a "direct file" and that a preliminary hearing had been held only on count I. Defense counsel explained, "[I]nitially there was a child abuse charge filed at the county court level and at the prelim that child abuse charge was dismissed. However, the State allegedly has more information now and has re-filed."

At a pretrial hearing on June 8, 2021, the State said there was to be an arraignment on the second charge that day.

Defense counsel requested a continuance of the previously scheduled trial, due to the additional charge. The court granted the continuance and scheduled the arraignment and pretrial hearing for July 9. However, following a discussion in which the judge granted a motion to recuse, the judge set trial for September 13 with a different judge.

The hearing in front of the new judge addressed only Johnson's bond. On August 2, 2021, defense counsel appeared before the court to schedule an evidentiary hearing, noting that "then we do have a prelim on the child abuse charge." The hearing to address all pending matters before trial was scheduled for August 23.

At the hearing on August 23, 2021, the State explained, "We have the preliminary hearing set today I believe on the child abuse," but it did not object to a motion by defense counsel to continue the scheduled hearing on certain defense motions. All matters, including the preliminary hearing, were postponed in order for the defense to hire its own expert. A pretrial conference was set for September 16, when the parties would know more about the status of the case.

At that pretrial conference, defense counsel noted that "we have a few motions and a preliminary hearing that we need to schedule" before the trial. The preliminary hearing and hearing on defense motions was scheduled for September 30, 2021, with the understanding that it may have to be rescheduled, which it apparently was. No hearing is reflected in the record until December 16. At that hearing, defense counsel, who had been appointed by the court, moved to withdraw. The court overruled the motion.

At a hearing on January 27, 2022, defense counsel raised that the matter needed to be set for trial and "have one date set for potential other pretrial motions" and a status hearing. The preliminary hearing to determine probable cause on count II was not specifically discussed. Bond was raised due to Johnson's continuing issues with testing positive for marijuana. A hearing was scheduled for February 9.

On February 9, 2022, defense pretrial motions were addressed. Also discussed was Johnson's bond. Again, there was no discussion of a preliminary hearing on count II.

Ultimately, no preliminary hearing on count II is reflected in the record to have occurred in district court. A formal arraignment was never held, and a plea was never entered to count II. At no point did defense counsel enter an express waiver of Johnson's right to a preliminary hearing on count II. Defense counsel did not move to quash count II of the amended information.

### 2. JURY SELECTION

During voir dire, the court made numerous general inquiries of the jurors, including whether any of them knew Johnson, were biased for or against Johnson or the county attorney's office, had formed or expressed an opinion about Johnson, were related to any of the parties or attorneys, or had any reason why they could not sit as a fair and impartial juror in the case. The State, during its voir dire, described who the witnesses at trial would be and asked whether anyone knew any of them. One of the jurors said he goes to church with the State's proposed witness, Officer Jorge Rodriguez. He did not think that would affect him one way or another in the case. A second juror stated he had worked with Rodriguez professionally through his job as a paramedic and firefighter.

Although defense counsel asked several questions of the venire during his voir dire, no further inquiry was made of the two jurors regarding how their relationship with Rodriguez may impact their ability to be a fair and impartial juror. Neither juror was subjected to peremptory challenges or challenges for cause. They both were impaneled and took part in convicting Johnson.

### 3. SEQUESTRATION

After opening statements and before the State called its first witness, the court took up a motion by defense counsel to sequester the witnesses. When asked if it had any

objection, the State responded, "No. As I said, I'll desig-
nate Aubrey [Michaels], but, Rodriguez, you're first anyway."
Aubrey Michaels is the wife of one the victims and the mother
of the other victim and was a witness to the incident that led to
the State's charges against Johnson. The court responded, "All
right. If you're a witness and you have not been designated,
please leave the courtroom at this time." Johnson did not chal-
lenge or object to the State's "designation" of Aubrey or her
subsequent direct or rebuttal testimony. The record is not clear,
but Aubrey was arguably present in the courtroom during the
presentation of all of the evidence.

## 4. Trial

Several facts were not in dispute at trial. On September
17, 2019, an altercation occurred between Johnson and Jared
Michaels, which culminated in Johnson's throwing a metal
folding chair that struck and injured Jared. Jared and Johnson
are stepsiblings.

The incident began in a parking lot. Jared; his wife, Aubrey;
their 5-year-old daughter; and their 1-year-old son had arrived
home from grocery shopping. Jared and Aubrey were unloading
groceries from the back of their van, when Johnson approached
from an alley. The alley separated the building containing a
local bar called the Office Bar from the building where Jared
and his family lived.

Jared had parked facing the side wall of the building con-
taining the Office Bar. The van was parallel to a sidewalk that
ran past the front of the building where the entrance to the
Office Bar was located.

Separating the parking lot from that sidewalk was a concrete
wall, which was 3 feet 6 inches in height. The concrete wall
ran along the sidewalk as a barrier to the parking lot and ended
where the wall joined the front corner of the building contain-
ing the Office Bar. Jared and Aubrey's van was parked in the
second stall from the concrete wall, effectively inside a corner
formed by the side of the building and the concrete wall.

When Johnson saw Jared and Aubrey's daughter, Johnson said something to her. At this point, Jared and Johnson were on the same side of the concrete wall. Words were then exchanged between Jared and Johnson. The nature of what was said was in dispute, but the parties agreed that some of the words exchanged between Jared and Johnson were not pleasant.

Jared never left the parking lot, but Johnson eventually made her way to the sidewalk on the other side of the concrete wall. She walked along that sidewalk, in the direction of the Office Bar, on the opposite side of the wall from Jared. She eventually reached the end of the concrete wall and went a couple of steps beyond the parking lot to the front of the Office Bar. There, she retrieved a metal folding chair. She turned back toward Jared and hurled the chair over the concrete wall to where Jared stood on the other side. Then she ran away.

In opening statements, the prosecution asserted that the words Johnson said to the daughter were very upsetting and that Jared tried to tell Johnson to watch her language. Eventually, Johnson threw the chair at Jared's face, and he suffered injuries as a result. The prosecution argued that Johnson's actions had endangered the daughter's mental health.

Defense counsel in opening statements disputed that Johnson said anything inappropriate to the daughter. He admitted there was an argument between Jared and Johnson, which escalated. The daughter may have seen the "chair-throwing incident," but she was inside the van when that occurred. Defense counsel argued that when Johnson threw the chair, Jared was following Johnson and Johnson was "just trying to get away from the situation."

### (a) Rodriguez

Rodriguez was the State's first witness. He testified that he arrived at the Michaels' apartment approximately 45 minutes after the incident in question, after Jared and Aubrey had stopped at the police station to report the incident. He testified that the daughter was visibly scared. The daughter

related something to him about a "crazy lady" and how "'daddy was there to protect them.'" Rodriguez observed that Jared had a swollen thumb and was bleeding from his shin. During direct, Rodriguez' testimony laid foundation for photographs of the area and of Jared's injuries, as well as a surveillance video from across the street. In rebuttal, Rodriguez elaborated that the alley was more than 5 feet from where the van was parked in the parking lot.

### (b) Aubrey

Aubrey was the second witness to testify. She testified that she, Jared, and their two children had exited the van and were unloading groceries from the back of it, when she heard yelling. She watched as Johnson, whom she recognized, walked from an alley into the parking lot and toward the van.

As Johnson was walking toward Aubrey's daughter, Johnson asked the daughter whether Jared and Aubrey were her parents. When the daughter responded that they were, Johnson said: "'They are the worst fucking shittiest parents in the world. Your mom is a whore. She puts her pussy all over town. Does your dad put his dick in your mouth? Do you like your dad's dick?'" During this time, Jared was trying to tell Johnson to "watch her language." Aubrey described that her daughter was upset and crying.

Aubrey was able to get her children back into the van. Aubrey testified that as she was getting the children into the van, Jared placed himself between Johnson and the children. Johnson spit at Jared and walked out of the parking lot to the other side of the concrete wall. Aubrey then watched from inside the van as Johnson walked along the sidewalk and disappeared from sight as she reached the front of the Office Bar.

Aubrey thought that Johnson had left and that the confrontation was over. But Aubrey and her daughter watched through the van window as Johnson picked up a chair sitting outside the bar and walked toward Jared. Jared, who was about 3

feet from Johnson, started walking backward. Johnson then threw the chair directly at Jared's head, from a distance of about 5 feet. Jared was able to deflect the chair with his hand. The chair fell and hit his leg. After that, Johnson departed.

Aubrey described that her daughter was hysterical, crying and screaming. Each night for almost a year after the incident, her daughter woke up crying and screaming, "'Help me, save me, she's coming.'" Aubrey described in some detail how her daughter, who was 7 years old at the time of trial, continues to struggle with anxiety and a fear of unknown situations.

### (c) Jared

Jared testified that Johnson was approximately 20 to 30 feet from him and his family when he first heard her yelling and approaching from the alley. At some point, Johnson left the alley and walked into the parking lot, getting closer to his daughter at the back of their van. Jared described first hearing Johnson say in a sarcastic tone, "'Isn't this a beautiful family.'" He then described, similarly to Aubrey's testimony, what Johnson said to his daughter.

Jared testified, "[A]s soon as I heard the first vulgar word out of her mouth, I started shouting, 'Watch your language,' to try to drown it out to limit what my daughter did hear." Jared described that he just kept saying, "'Watch your language'" until Johnson finished, but that he did not do anything else.

Johnson kept walking. After Aubrey and the children were safely in the van, Jared stepped away from the van "to create distance of me to the van to just keep her away from my family." This meant he was walking toward Johnson. As Jared got closer to Johnson, she spat on him.

During this time, there was some interaction wherein Johnson told Jared, "'Didn't I try to protect you when you were little,'" and Jared said no. According to Jared, the only time he yelled was when he had been "trying to drown out the profanities she was saying to my daughter." When he was walking toward Johnson, he was "responding to her only."

Johnson continued to walk away and out of the parking lot. She then walked along the sidewalk that ran along the other side of the concrete wall and toward the Office Bar. Jared, who was still engaged with Johnson from the other side of the wall, told Johnson "to go be a good mother because no good mother would say those things." According to Jared, Johnson turned around, grabbed a chair, and threw it at him.

Jared explained that when Johnson threw the chair, he stepped back off a curb he was apparently standing on at the time, so that he would not fall. When he was hit by the chair, Jared was approximately 5 feet from Johnson. Jared never went to the other side of the concrete wall. Jared described his injuries from being hit by the chair and the negative impact of the incident on his daughter's mental health.

### (d) Johnson

Johnson testified in her own defense, describing that it was coincidental that she ran across Jared and his family on September 17, 2019. She testified she was walking through the alley near the Office Bar, when she saw two figures outside of a van. She then recognized the daughter, who jumped out of the van to wave at her "really excitedly." She explained the daughter had been inside the van in the back seat with the door open. Johnson often saw Jared and Aubrey's daughter, because she went to the same daycare as Johnson's son. According to Johnson, "[s]he'd always wave at me at daycare."

Johnson said she spoke to the daughter on the day in question only because "she was happy to see me and waving at me." Johnson did not stop but continued walking as she asked the daughter whether this was her family. When the daughter said it was, Johnson said she had a "picture perfect family." Johnson denied making any inappropriate remarks to the daughter. Johnson testified that when she said that, Jared told her, "'You do not talk to my daughter. You do not talk to my wife. You do not talk to my family.'"

Johnson testified that Aubrey took the children into the van, grabbing the daughter's arm and saying, "'I told you not to talk to that crazy lady.'" Johnson testified she never saw the daughter cry, but imagined that was the cause if she did. Johnson testified she continued to walk past the van and move away from Jared and his family, telling Jared to stop following her. Her path was not blocked by Jared.

Johnson testified that she tried to cross the street to get further away, but that traffic did not allow her to. Jared kept following her, and she again asked him to stop. Johnson walked along the sidewalk separated from the parking lot by the concrete wall, in the direction of the Office Bar, while Jared stayed on the parking lot side.

Johnson testified that when Jared told her to be a good mother, she responded by telling Jared he "could be a good parent by getting his dick out of his daughter's mouth." Johnson testified that Jared then started "pounding his hands and fists like in a fist motion on the concrete and following me down" the street from the other side of the wall, telling her that she was going to regret saying that. Jared also told her that she was "'batshit crazy,'" her mom was a "'nutbag,'" and she was a "'whore that spreads her legs all over town,'" "'[j]ust like your kids' dad said . . . .'"

Johnson admitted that Jared never left the area between the van and the wall. Nevertheless, she was very scared and wanted to distract Jared. She was afraid that Jared, who was 6 feet 4 inches tall, was going to jump over the wall and "punch" her. Johnson testified that she grabbed a chair from in front of the bar, went back toward Jared a couple of steps, and threw it "on the barricade," in the direction of Jared. Johnson testified she was not trying to hit Jared. Johnson then "took off running."

### (e) Rebuttal

The State called Aubrey as a rebuttal witness. Aubrey denied that her daughter approached Johnson or that she had

jerked her daughter's arm in order to get her back into the van. Aubrey testified that although she could see Jared at the corner of the parking lot on the other side of the concrete wall from Johnson, she never saw Jared pound his hands on the wall or otherwise threaten Johnson.

Jared was also called to testify on rebuttal. He stated that he did not tell Johnson she would "'regret this'" or otherwise threaten force against Johnson, chase her, pound his fists against the concrete wall, or try to jump the concrete wall. He also denied that his daughter approached Johnson or that his daughter had ever even met Johnson, stating, "My daughter does not know who she is and I've made it my goal in life for that to be the case." Jared said his daughter went to school in a different part of the same building where Johnson's son went to preschool.

### (f) Video Surveillance

Surveillance video from a nearby business is somewhat difficult to decipher but generally confirms the location of the parties and the van and that there was some traffic on the street when Johnson exited the parking lot. After Johnson exited the parking lot and started walking along the sidewalk, Jared stayed in the parking lot between the van and the concrete wall. Jared and Johnson appear engaged with each other from across the wall, both moving back and forth, before Johnson went decidedly in the direction of the Office Bar, apparently retrieved the chair, and threw it at Jared.

### 5. CLOSING ARGUMENTS AND JURY INSTRUCTIONS

In closing arguments, defense counsel argued that Johnson did not intentionally or knowingly cause Jared bodily injury. Instead, she threw the chair at the barricade as a way to distract Jared so that she could get away. Whether Johnson acted recklessly was a different question. With respect to the

charge of child abuse, defense counsel argued Johnson never said the things that Jared and Aubrey accused her at trial of saying. Defense counsel continued, "I'm not going to argue about the fact that [the daughter] went to counseling." But defense counsel pointed out Johnson did not know the daughter was still watching from the van when she threw the chair, so she did not intentionally or knowingly place the daughter in that situation.

With respect to count I, the court instructed on the lesser-included offense of assault in the third degree. With respect to count II, it instructed on the lesser-included offense of negligent child abuse.

The court refused defense counsel's requested self-defense instruction. It reasoned that there was no evidence at trial supporting "a verbal or physical threat of harm or any actual harm that would justify the use of immediate physical force by [Johnson] toward Jared." The court said that even assuming Johnson's testimony to be true that Jared told her she would regret saying what she did and pounded his fists on top of the concrete wall, Johnson left the area where Jared was to retrieve the chair. She then returned to Jared to throw it in his direction. The court said that, thus, even under Johnson's own testimony, she was the "first aggressor."

The jury found Johnson guilty of assault in the second degree. It found Johnson not guilty of intentional child abuse, but guilty of negligent child abuse.

## 6. SENTENCING

The court sentenced Johnson to concurrent sentences of 6 months in jail on the conviction of second degree assault and 10 months in jail on the conviction of negligent child abuse.

At the sentencing hearing, the court acknowledged that there was nothing in Johnson's criminal history involving assault or abuse and that she did not "seem to be the type of person to have done this by looking at your prior criminal

history." The court also noted there did not seem to be a lot of substance abuse problems in Johnson's life other than with marijuana. The presentence investigation report (PSI) showed Johnson had been employed with her current employer for 11 years.

The PSI showed Johnson had a criminal history of traffic violations, including willful reckless driving, disturbing the peace, obstructing a police officer, resisting arrest, and shoplifting. She scored in the low risk level for criminal history; the medium risk level for education/employment, companions, and alcohol/drug problems; a high risk level for leisure/recreation; and very high in procriminal attitude and antisocial pattern.

The court stated at the hearing that it had to "adhere to the jury's findings and their conclusions. And they came to the conclusion that you did say those things to the girl, that you abused her in that way." It went on to state, "[H]onestly, I tended to agree with the jury's findings in that regard." What the court found the "most disturbing . . . was the things that were said in front of the child."

The court also noted that while Johnson claimed she was scared of Jared and trying to get away, she was past the edge of the wall where it met the building, and thereby "away," when she decided to pick up a chair and go back to where she could throw it toward Jared. The court explained:

> I don't agree that you did that sort of because you were so fearful and wanted to get away and didn't know what else to do and sort of did that as a reaction to that. I think you were away and then saw the chair and thought "I'm going back." That's how the facts were laid out. So, I don't really feel like there is a real belief on your part that you really did anything wrong here.

In general, the court said that "the impression that I got" from the evidence at trial and the PSI was that Johnson did not feel she had done anything wrong. The court did

not think Johnson was likely to respond positively to probationary treatment, because she did not seem very amenable to the structure of such programming in that she did not think she had done anything wrong. Finally, the court said that a sentence less than incarceration would depreciate the seriousness of the crimes and promote disrespect for the law.

In its sentencing order, the court reiterated that there were substantial and compelling circumstances such that Johnson was not a suitable candidate for probation and that a sentence lesser than incarceration would depreciate the seriousness of the offense and promote disrespect for the law. The court also found that there was a substantial risk Johnson would engage in additional criminal conduct during any period of probation and that she was in need of correctional treatment which could be provided most effectively by commitment to a correctional facility.

## III. ASSIGNMENTS OF ERROR

Johnson assigns that the district court erred by (1) failing to instruct the jury on self-defense; (2) failing to sequester a State's witness at Johnson's request, in violation of Neb. Rev. Stat. § 27-615 (Reissue 2016); and (3) imposing excessive sentences. Johnson assigns that trial counsel was ineffective by failing to (1) file a motion to quash the amended complaint and (2) ensure that an impartial jury was impaneled for trial. We disregard an assignment of error which Johnson abandoned in her reply brief.

## IV. STANDARD OF REVIEW

[1] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.[1]

---

[1] *State v. Loyd*, 275 Neb. 205, 745 N.W.2d 338 (2008).

[2] Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.[2]

[3] It is for the trial court to determine the extent to which a sequestration order will be applied in a given case.[3]

[4] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[4]

[5] A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.[5] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[6]

## V. ANALYSIS

### 1. Lack of Preliminary Hearing on Count II

Johnson asserts that trial counsel was ineffective by failing to move to quash count II of the information on the grounds that no preliminary hearing had been held or waived. In spite of the State's assertion otherwise at oral arguments, the record on appeal does not show that a preliminary hearing was held. Johnson relies on a Nebraska case stating that a district court lacks jurisdiction to try an individual on a felony charge unless the accused has been accorded the privilege of a preliminary hearing or waives the same.

---

[2] *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

[3] *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

[4] *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

[5] *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022).

[6] *Id.*

The foundation of Johnson's argument lies in an 1889 decision that we overruled in 1895. In *White v. State*,[7] we held that a district court had no jurisdiction to try an accused person until a preliminary examination had been held according to law. But in *Coffield v. State*,[8] we overruled this holding from *White*. In doing so, we said that the "failure to give a prisoner a preliminary examination does not oust the district court of jurisdiction" but is a "mere defect in the proceedings," which, pursuant to Neb. Rev. Stat. § 29-1812 (Reissue 2016), may be excepted to by a motion to quash, a plea in abatement, a demurrer to the indictment, or a plea in bar, and the accused will be deemed to have waived the defect if the objection is not timely made.[9] Thus, over a century ago, we rejected the jurisdictional argument. In three later cases (which include the case Johnson cites),[10] we allowed this language of jurisdiction to seep back into a discussion of preliminary hearings. We now expressly disapprove those cases to the extent that they do so.

[6-8] The proper method of objecting to trial in the district court for the insufficiency of a preliminary hearing, or the failure to provide one at all, is by a timely motion to quash or a plea in abatement.[11] Any error by the trial court in overruling a defendant's plea in abatement alleging there was insufficient evidence presented at a preliminary hearing to bind the case over for trial is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported

---

[7] *White v. State*, 28 Neb. 341, 44 N.W. 443 (1889). See *Latimer v. State*, 55 Neb. 609, 76 N.W. 207 (1898).

[8] *Coffield v. State*, 44 Neb. 417, 62 N.W. 875 (1895).

[9] *Id.* at 421, 62 N.W. at 876.

[10] See, *State v. Hill*, 255 Neb. 173, 583 N.W.2d 20 (1998); *State v. Kelley*, 211 Neb. 770, 320 N.W.2d 455 (1982), *disapproved on other grounds, State v. Wright*, 261 Neb. 277, 622 N.W.2d 676 (2001); *State v. Forbes*, 203 Neb. 349, 278 N.W.2d 615 (1979).

[11] *State v. Hill, supra* note 10. See *State v. Howard*, 184 Neb. 274, 167 N.W.2d 80 (1969).

by sufficient evidence.[12] Likewise, a failure to hold a preliminary hearing is cured by a subsequent conviction supported by sufficient evidence that the defendant is guilty beyond a reasonable doubt. Conducting a preliminary hearing after a trial would not only serve no purpose, but it "would compound the degradation and expense that the preliminary hearing serves to protect against."[13]

[9] It necessarily follows that if the trier of fact, upon sufficient evidence, has found the defendant guilty of the charged crime beyond a reasonable doubt, the defendant cannot show prejudice resulting from trial counsel's failure to object to the lack of evidence supporting probable cause at a preliminary hearing, or to object to the failure to hold a preliminary hearing at all. Accordingly, in *State v. Nesbitt*,[14] we found that the court properly denied, without an evidentiary hearing, the defendant's claim that trial counsel was ineffective for not timely filing a plea in abatement challenging the probable cause to believe he had committed the charged crime, because the jury's finding of guilt beyond a reasonable doubt "resolved any questions about whether probable cause existed to bind [the defendant] over for trial." Similarly, in *State v. Hubbard,*[15] we determined on direct appeal that because the defendant was ultimately found to be guilty beyond a reasonable doubt, he would not, as a matter of law, be able to establish prejudice from trial counsel's allegedly deficient conduct of failing to move to quash or file a plea in abatement. We explained that even if the court had failed to consider whether there was probable cause to bind the defendant over for trial,

---

[12] E.g., *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014); *State v. Nesbitt*, 264 Neb. 612, 650 N.W.2d 766 (2002); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Baker*, 224 Neb. 130, 395 N.W.2d 766 (1986); *State v. Franklin*, 194 Neb. 630, 234 N.W.2d 610 (1975). See, also, *State v. Chauncey*, 295 Neb. 453, 890 N.W.2d 453 (2017).

[13] *State v. Aleh*, 357 P.3d 12, 16 (Utah App. 2015).

[14] *State v. Nesbitt, supra* note 12, 264 Neb. at 620, 650 N.W.2d at 777.

[15] *State v. Hubbard*, 267 Neb. 316, 673 N.W.2d 567 (2004).

"any defect in the waiver of a preliminary hearing to determine probable cause is cured by a jury's later verdict finding the defendant guilty beyond a reasonable doubt."[16] The defendant "was not prejudiced because he was found guilty."[17]

[10] The record is sufficient to review the merits of the ineffective performance claims if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[18] The jury's verdict cured any defect of failing to hold a preliminary hearing on count II and established, as a matter of law, that Johnson will not be able to establish prejudice from trial counsel's allegedly deficient conduct in failing to move to quash the information on count II for the lack of a preliminary hearing. We find no merit to this claim of ineffective assistance of trial counsel.

## 2. Trial Counsel's Failure to Ensure Impartial Jury

Johnson also claims ineffective assistance of trial counsel in relation to the voir dire. Two of the impaneled jurors stated they had a personal relationship with one of the State's witnesses, and she argues trial counsel was ineffective by failing to ask followup questions about those relationships and how they may impact the jurors' ability to be fair and impartial. She argues that "[i]t is fair to reason" that the jurors "would be inclined to give more weight and trust to the testimony of . . . Rodriguez due to their relationship."[19] Thus, she argues she was prejudiced. Johnson also makes a more general claim of ineffective assistance, because trial counsel asked the full jury panel only six questions and trial counsel's

---

[16] *Id.* at 326, 673 N.W.2d at 577.

[17] *Id.*

[18] See *State v. Miranda, supra* note 2.

[19] Brief for appellant at 27.

examination of the jury panel took up only two pages of the bill of exceptions.

We pointed out recently in a claim of ineffective assistance on direct appeal, based on defense counsel's relatively brief voir dire compared to the State's examination, that "brevity alone is not enough to show that his trial counsel's performance was deficient."[20] We concluded that such a claim lacked sufficient specificity.[21] We likewise find here that Johnson failed to sufficiently raise an ineffective assistance claim based on a general failure to ask more questions during voir dire.

Johnson has sufficiently raised a claim of ineffective assistance of trial counsel regarding the two jurors who said they knew Rodriguez, but she cannot show prejudice from the failure to ask those jurors more followup questions. Even if more questioning would have confirmed a significant bias, and that bias caused those jurors to unduly trust in the veracity of Rodriguez' testimony, the record shows that Rodriguez did not testify as to any matter in dispute at trial. Rodriguez was not a witness to the incident. He merely testified as to the daughter's demeanor after the incident, Jared's injuries, and the layout of the physical scene. The defense did not dispute any of these matters. There is no merit to Johnson's claim that trial counsel was ineffective in failing to ask the two jurors followup questions about their relationships to Rodriguez and how those may impact their ability to be fair and impartial.

### 3. SEQUESTRATION

We turn to Johnson's assertion that the trial court erred in refusing to sequester Aubrey, who testified after hearing Rodriguez' testimony and again in rebuttal. Before the State called its first witness, the court granted defense counsel's motion to sequester the witnesses, but granted the State's

---

[20] *State v. Miranda, supra* note 2, 313 Neb. at 374, 984 N.W.2d at 275.

[21] See *id.*

request to designate Aubrey as an exception to the sequestration order.

[11] Sequestration is based on the belief that not hearing other witnesses' testimony tends to better elicit the truth and promote the ends of justice.[22] Section 27-615 states:

> At the request of a party the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and he may make the order on his own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

[12-14] While it is unclear how Aubrey falls under § 27-615(1) through (3), Johnson did not object at any point before or during the trial to the court's decision to exempt Aubrey from sequestration. A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal.[23] An appellate court will not consider an argument or theory that is raised for the first time on appeal.[24] Thus, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.[25] We conclude that Johnson failed to preserve this issue for appellate review.

## 4. Self-Defense Instruction

[15,16] Johnson argues the trial court erred in failing to instruct the jury on self-defense. To establish reversible error

---

[22] *State v. Trail, supra* note 3.

[23] *Eletech, Inc. v. Conveyance Consulting Group*, 308 Neb. 733, 956 N.W.2d 692 (2021).

[24] *Id.*

[25] *Id*.

from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[26] It is not enough to merely show "'any evidence'" of self-defense to support an instruction thereon.[27] Instead, the defendant must show "'any evidence in support of a legally cognizable theory of self-defense.'"[28] Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense.[29] If the trial evidence does not support a claim of self-defense, the jury should not be instructed on it.[30]

Neb. Rev. Stat. § 28-1409(1) (Reissue 2016) provides in relevant part that "the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." Section 28-1409(5) provides that when the force is not deadly or used to resist another's occupation of property under a claim of right, "a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action."

[17,18] We have interpreted § 28-1409 to mean that to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be

---

[26] *State v. Case, supra* note 4.

[27] *Id*. at 843, 937 N.W.2d at 226.

[28] *Id*.

[29] *State v. Case, supra* note 4.

[30] *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006).

immediately necessary and justified under the circumstances.[31] To instruct on self-defense, it is not enough that the defendant subjectively believed in the need to use force for self-protection; the defendant must produce evidence that this subjective belief was also objectively reasonable.[32]

Johnson admitted Jared never left the area between the van and the concrete wall. Based on Jared's allegedly pounding his fists on top of the wall while telling her she was going to regret saying what she did, Johnson testified she was afraid Jared was going to jump over the wall and "punch" her. Even if it was reasonable to infer that Jared was physically capable of jumping over the wall and that Johnson subjectively feared he would do so and then hit her, there was no evidence that Jared had made any move to jump over the wall or had threatened to jump over the wall when Johnson decided to throw a chair at him. As such, even resolving all reasonable inferences in Johnson's favor, the evidence does not support a "reasonable and good faith belief" that force was "immediately necessary" for Johnson to protect herself against the use of unlawful force by Jared.

Relatedly, the evidence does not support the conclusion that Johnson's act of throwing the chair at Jared was justified under the circumstances. We have explained that "[i]f a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense."[33] Thus, in *State v. Marshall*,[34] an instruction on self-defense was properly denied when the defendant had voluntarily put himself in a position of danger by going outside of his home to confront two men and there was no evidence that anything prevented him

---

[31] *State v. Case, supra* note 4.

[32] See *State v. Eagle Thunder*, 201 Neb. 206, 266 N.W.2d 755 (1978).

[33] *State v. Urbano*, 256 Neb. 194, 201, 589 N.W.2d 144, 151 (1999). Accord *State v. Case, supra* note 4.

[34] *State v. Marshall*, 253 Neb. 676, 573 N.W.2d 406 (1998).

from remaining safely in his home. Similarly, in *State v. Case*,[35] the evidence did not support a self-defense instruction when the defendant left the safety of his jail cell and walked directly up to the victim, who allegedly made the first move toward the defendant thereafter. The use of force was not justified under the circumstances.

Johnson's act of taking a couple of steps beyond the parking lot before returning toward Jared is perhaps distinct from these scenarios, but her act of throwing the chair at Jared was equally unjustified. As discussed, she was never in immediate harm's way. When she went in the direction of the chair and beyond the parking lot, Jared did not jump over the wall to pursue her. Instead, Johnson walked back toward Jared, where Jared continued to stand on the other side of the wall, and hurled a chair at him.

We agree with the trial court that even if the evidence is viewed consistent with Johnson's testimony, Jared's following along the other side of the wall while pounding his fists and saying Johnson would regret what she said did not legally justify the use of immediate physical force by Johnson toward Jared. The evidence at trial did not allow a reasonable inference that Johnson acted in self-defense. The court did not abuse its discretion in refusing to give a self-defense instruction.

## 5. Excessive Sentences

Lastly, we address Johnson's assignment of error that the court imposed excessive sentences. A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.[36] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[37]

---

[35] *State v. Case, supra* note 4.

[36] *State v. Greer, supra* note 5.

[37] *Id*.

Johnson's concurrent sentences of 6 months in jail on the conviction of second degree assault and 10 months in jail on the conviction of negligent child abuse were well within the statutory limits. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2022) authorizes a maximum sentence of 20 years' imprisonment with no minimum sentence for Class IIA felonies. Neb. Rev. Stat. § 28-106(1) (Reissue 2016) authorizes a maximum sentence of not more than 1 year's imprisonment with no minimum sentence for Class I misdemeanors.

Johnson argues that the court abused its discretion by imposing imprisonment rather than probation. Neb. Rev. Stat. § 29-2260(2) (Reissue 2016) describes that for a sentence for an offender convicted of either a misdemeanor or a felony for which mandatory or mandatory minimum imprisonment is not specifically required, the court may withhold sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because (a) the risk is substantial that during the period of probation the offender will engage in additional criminal conduct, (b) the offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility, or (c) a lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for law.

Section 29-2260(3) sets forth several grounds that while not controlling the discretion of the court, shall be accorded great weight in favor of withholding a sentence of imprisonment: (a) the crime neither caused nor threatened serious harm; (b) the offender did not contemplate that his or her crime would cause or threaten serious harm; (c) the offender acted under strong provocation; (d) substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense; (e) the victim of the crime induced or facilitated commission of the crime; (f) the offender has compensated or will compensate the victim of his or her crime

for the damage or injury the victim sustained; (g) the offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime; (h) the crime was the result of circumstances unlikely to recur; (i) the character and attitudes of the offender indicate that he or she is unlikely to commit another crime; (j) the offender is likely to respond affirmatively to probationary treatment; and (k) imprisonment of the offender would entail excessive hardship to his or her dependents.

[19,20] The sentencing court is not limited to any mathematically applied set of factors.[38] The appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[39]

Johnson focuses on her allegation that in reaching the decision to impose imprisonment rather than probation, the trial court improperly engaged in speculation as to the factual basis of the jury's verdict and her motives. She first argues that the court improperly concluded the jury found Johnson made disparaging comments to Jared and Aubrey's daughter, when the jury could have instead found her guilty based on the daughter's witnessing Johnson throw the chair at Jared. Second, Johnson argues the trial court improperly engaged in speculation and factual finding by determining that Johnson did not throw the chair at Jared because she was afraid; rather, she was "away and then saw the chair and thought 'I'm going back.'"

[21,22] So long as it does not concern a fact exposing the defendant to a greater punishment than that authorized by the jury's guilty verdict, it is not improper for a sentencing

---

[38] *Id.*

[39] *Id.*

judge to make factual findings for purposes of sentencing relating to the circumstances of the crime and which are supported by the evidence at trial, the PSI, or evidence submitted at the sentencing hearing.[40] In a sentencing hearing, the court generally has broad discretion concerning the scope and type of information to be considered.[41]

We disagree with Johnson that the judge's sentence of imprisonment was improperly based in unlawful speculation, because the judge said he must adhere to the jury's findings and the jury came to the conclusion that Johnson had made abusive comments to Jared and Aubrey's daughter. Rather, it appears from the context that the judge independently reached the conclusion, based on the evidence at trial and the PSI, that Johnson made abusive statements to the child. This was a proper finding to be considered in sentencing. Likewise, the judge did not abuse his discretion in finding that Johnson was "away" and returned to assault Jared and did not simply act out of fear. Such a conclusion is adequately supported by the record and was a proper consideration in sentencing.

The sentencing judge also made several findings not specifically challenged in this appeal. It found that Johnson did not feel she had done anything wrong. The judge found Johnson was unlikely to respond positively to probationary treatment, because she did not seem very amenable to the structure of such programming and she did not think she had done anything wrong. The judge found that there was a substantial risk Johnson would engage in additional criminal conduct during any period of probation and that she was in need of correctional treatment, which could be provided most effectively by commitment to a correctional facility. Finally, the

---

[40] See A.L.I., Model Penal Code: Sentencing § 7.07A (Tentative Draft No. 1 2007).

[41] See *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987), *overruled on other grounds, State v. Garza*, 236 Neb. 202, 459 N.W.2d 739 (1990).

judge found that a sentence less than incarceration would depreciate the seriousness of the crimes and promote disrespect for the law.

The court did not abuse its discretion in determining Johnson was not a suitable candidate for probation.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.