IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. FELIX

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

OLAJUWON A. FELIX, APPELLANT.

Filed June 10, 2025.    No. A-24-582.

Appeal from the District Court for Douglas County: TRESSA M. ALIOTH, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Tamara T. Mosby for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

Pirtle, Bishop, and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Following a jury trial, Olajuwon A. Felix was convicted of two counts of possession of a deadly weapon (firearm) by a prohibited person and one count of possession of a machine gun. After the Douglas County District Court found that Felix was a habitual criminal and that his current convictions for possession of a deadly weapon (firearm) by a prohibited person were second offenses, the court sentenced him to an aggregate of 60 to 100 years' imprisonment. On appeal, Felix claims there was not sufficient evidence to support his convictions and that his trial counsel was ineffective in various ways. We affirm.

## II. BACKGROUND

In March 2023, Felix was taken into custody near a vehicle being surveilled by law enforcement officers. Felix was in a face-down position near the ground when a firearm was observed under his person. The vehicle was behind a particular residence, and after a search

- 1 -

warrant was obtained for that residence, a second firearm was found inside a bag in a bedroom closet.

On May 11, 2023, the State filed an information charging Felix with: counts 1 and 2, possession of a deadly weapon (firearm) by a prohibited person, second offense, a Class IB felony, in violation of Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2022); count 3, "Possession of Machine Gun, Short Shotgun, Short Rifle," a Class IV felony, in violation of Neb. Rev. Stat. § 28-1203 (Reissue 2016); and count 4, possession of a stolen firearm, a Class IIA felony, in violation of Neb. Rev. Stat. § 28-1212.03 (Cum. Supp. 2024). The operative pleading at the time of trial was the third amended information that was filed on April 16, 2024. It included counts 1, 2, and 3 above, but count 4 now alleged only that Felix was a habitual criminal as described in Neb. Rev. Stat. § 29-2221 (Cum. Supp. 2024).

On October 5, 2023, Felix filed a motion to continue the jury trial scheduled to commence on January 29, 2024. His trial counsel was requesting additional time to "depose the DNA analyst who performed the DNA testing on the firearms using swabs from Mr. Felix" and to "consult potential experts and ultimately work with the expert to prepare for trial."

On December 29, 2023, Felix filed a motion with the district court to conduct additional DNA testing on the firearms; this was granted. He also asked the district court to enter an order reducing his bond by $2,894 and releasing the funds to a named testing facility; this was also granted.

A jury trial was held in April 2024. Several witnesses, including law enforcement officers from the Omaha Police Department (OPD), testified for the State and numerous exhibits were received into evidence. Felix did not testify in his own behalf, nor did he call any witnesses.

Detective Jeffrey Wasmund testified that on March 6, 2023, he was assigned as the lead detective in an investigation of a felony assault shooting that occurred the previous day. He reviewed all the reports that had been documented by the officers and noted that an officer from the unit who responded to the incident had already "put out a bulletin of a vehicle we believed to possibly be affiliated with the suspects"; "they actually posted actual video from the scene that showed a black, newer Ford Mustang Convertible," "[y]ou could tell it had the soft cloth top -- it was up." Based on the description of the vehicle, and some information that the vehicle may have out-of-state license plates, Detective Wasmund thought there was a "strong possibility" that it was a rental car. Upon further investigation, he learned from a manager of a rental car company that a black 2021 Ford Mustang convertible with an Indiana license plate had been rented to Taylor Sellers-Bryant, and that her address was on Fowler Avenue; Detective Wasmund added on to the previous bulletin that "this black Mustang . . . could possibly be the car." The vehicle was later found behind that Fowler Avenue residence. While preparing a search warrant for the residence, he was advised that a suspect, later identified as Felix, had been apprehended outside of that residence.

Detective Jacob Haniszewski testified that around 8 p.m. on March 6, 2023, he was conducting a follow-up investigation regarding a shooting. A black Ford Mustang with a cloth-top convertible and a bent out-of-state license plate was believed to be related to the shooting, and it had been located at a specific address on Fowler Avenue. Detective Haniszewski and other law enforcement officers went to that area, set up a perimeter, and conducted surveillance on the Mustang, which was parked on the side of the rear drive of the residence. Detective Haniszewski

was in an unmarked car with another detective and Detective Adam Vail was driving. Detective Haniszewski was wearing plain clothes with a marked vest, a badge, and a body-worn camera.

Detective Ryan Sillman testified that he walked down an alleyway behind the Fowler Avenue residence and observed a black Ford Mustang with the identifying Indiana license plate. When he returned to his own vehicle, he "radioed" to the other officers.

Detective Haniszewski stated that another surveillance officer advised over the radio that an individual had exited out of the rear door of the residence and was getting into the Mustang. The officer then advised that the Mustang was turned on and began backing up. At that point, Detective Haniszewski activated his body-worn camera, and the vehicle he was riding in drove down the alleyway and "rounded the corner into the backyard" of the residence. Detective Haniszewski stated:

> Once we rounded the backyard, the Mustang drives forward several feet. There's a brief pause there. We weren't really sure what he was going to do, if he was going to try to take off through the yard or what. He ends up getting out. At that point, we see him trying to run towards the back door of the residence, and we then chase him on foot.

Detective Vail was the first to make physical contact with Felix, and Detective Haniszewski was the second to make contact. Detective Haniszewski testified, "I had heard Detective Vail . . . shout 'Gun, gun, gun.' At that point, I started looking around for it. I see it laying under, essentially, the front, right abdomen area," and "[o]nce I saw it and not really able to gain full control of [Felix's] arm as he's reaching back down towards that area, I grabbed it with my left hand and tossed it behind us just out of reach of everybody." (Detective Haniszewski was not wearing gloves when he grabbed the firearm.) According to Detective Haniszewski, it is common for individuals to carry firearms in their waistbands, "[t]ypically, front right side, unless it's left-handed, front left side." After Felix was handcuffed, Detective Haniszewski searched him; "some marijuana and personal property" were found during the search.

Detective Haniszewski identified exhibit 7 as the firearm that he tossed and that was seized on March 6, 2023. He said, "It's a Glock 17, a 9 millimeter handgun. It has an apparent Glock switch." He explained that "when placed on a Glock handgun, [a switch] enables the Glock to fire at a fully automatic capacity. So a single trigger pull would fire multiple rounds as opposed to them being only capable of typically firing one round per trigger pull." He identified exhibit 8 as the magazine containing ammunition that was on the firearm when it was located.

Detective Vail testified that he observed the gun "directly underneath [Felix's] person" and called out to his partners so that they were all aware. After Detective Haniszewski moved the gun for officer safety reasons, they detained Felix. Detective Jamison Perry picked the firearm up off the ground and put it on the hood of the Mustang. (This was confirmed during Perry's testimony, and Perry did not believe he was wearing gloves when he picked up the firearm). Then Detective Vail took the firearm and placed it in his vehicle until the forensics unit could recover it. Both Detectives Vail and Perry identified exhibit 7 as that firearm.

The footage from Detective Haniszewski's and Detective Vail's body cameras was received into evidence. Collectively, the footage shows that law enforcement activated their vehicle's lights and sirens while driving, and then another vehicle is seen pulling forward into a driveway. It was dark outside. The officers ran towards the vehicle in the driveway and one of

them yelled, "Show me your hands, now!" The officers approached Felix, who was face-down near the ground on a little sidewalk in front of the vehicle in the driveway. At least one officer had his hands on Felix's back, and someone yelled, "Gun, gun, gun, gun, gun, gun, gun, gun, gun!" Someone then yelled, "Don't f[******] reach for it." Felix responded, "I'm not reaching for nothing." The officers handcuffed Felix behind his back while he was on the ground. He was then helped to his feet, his pockets were searched, and he was taken to a vehicle by an officer. Someone on the video can be heard saying, "The firearm does appear to have a switch on the back of it."

Sergeant Emilio Luna testified that he was present during the surveillance of the Mustang at the Fowler Avenue residence. After Felix was taken into custody, Sergeant Luna had other detectives ask Felix, for safety reasons, if there were any other people in the house because a search warrant was being drafted; Felix informed them there was a female and four children in the house and he provided law enforcement the female's phone number so they could contact her and have her come out of the house. The female, Sellers-Bryant, agreed to come out of the house, and she had her four children with her. Because of the weather, she and the children were allowed to go back into the house with officer supervision. A search warrant for the Fowler Avenue residence was obtained within about 2 hours of Felix's arrest.

Detective Wasmund testified that he arrived at the residence shortly after advising the officers that the judge had signed the search warrant. Detective Wasmund interviewed Sellers-Bryant, and she told him that Felix was her boyfriend.

Detective Perry testified that after the search warrant was obtained, he was assigned to search the southwest bedroom. He put on latex gloves before he performed the search. While searching the closet in the bedroom, he found a "large plastic bag" "hanging up behind clothes." "Inside of the bag," he "found a small amount of marijuana -- approximately 6 grams -- a Glock firearm 10 millimeter, 9 millimeter ammunition, and a traffic citation [issued to Felix]"; the citation had been issued on December 28, 2022, and listed an upcoming court date of March 17, 2023. Detective Perry was wearing a body camera while he conducted the search on March 6, and the footage was received into evidence.

Mackenzie Miller was a forensic trainee with OPD on March 6, 2023. She had completed her "proficiency and competency" testing and was "going to crime scenes independently, but [she] was still having all of [her] work tech-reviewed or reviewed by a forensic technician to ensure that [she] was following all the procedures." Miller became a fully qualified forensic technician in May. On March 6, she was dispatched to the Fowler Avenue residence. At the residence, she collected the two firearms that were recovered--the Glock 17 9-mm and the Glock 40 10-mm. When she returned to the forensics laboratory, she "booked" the two firearms in and attempted to collect fingerprints from them but was not able to recover any fingerprints with "enough quality and quantity to be of evidentiary value." Miller also collected DNA swabs for both firearms.

The parties stipulated that Miller collected swabs for possible DNA on both firearms and they were then taken in sealed packaging to the University of Nebraska Medical Center (UNMC) "DNA Lab" for testing; the swabs (in the still-sealed evidence packaging) were subsequently received by Alexa Atencio on September 28, 2023, at the UNMC DNA Lab. The parties also stipulated that Detective Wasmund collected a buccal swab from Felix at Douglas County Corrections on September 28 and it was taken in sealed packaging to the UNMC DNA Lab for testing; the swab (in the still-sealed evidence packaging) was received by Atencio that same day.

Atencio, a forensic DNA analyst at UNMC, testified that she was able to generate DNA profiles from the 9-mm and 10-mm handguns and from Felix. The DNA profile from the 9-mm handgun was a "four-person mixture," and Felix was not excluded as a "minor contributor." For the 9-mm handgun, "The DNA profile is at least 23.7 billion -- which has 9 zeros -- times more likely if it originated from . . . Felix and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals." Atencio stated that the DNA profile from the 10-mm handgun was also a mixture of four individuals, and Felix was not excluded as the "major contributor," i.e., "someone that left more of their DNA behind." For the 10-mm handgun, "The DNA profile is at least 350 septillion -- which has 24 zeros -- times more likely if it originated from . . . Felix and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals."

Atencio generally explained that "when we're talking about firearms, we're dealing with something called touch DNA. So that is just DNA that is left behind after an item has been touched." "Usually, the last person that handles an item can typically leave more of their DNA, hasn't been rubbed off or wiped away or used by somebody else," "[s]o that is an instance where there could be a major contributor." When asked, "So, for example, in the case of the 9 millimeter, if Mr. Felix was the third to last person to touch a 9 millimeter, would that possibly explain why he's a minor contributor?" Atencio responded, "Absolutely. With multiple DNA transfers, there is a loss of DNA as something's being transferred from one surface to another and to another."

Angela Harder is a senior forensic technician and firearm and tool mark examiner with OPD. She test-fired the Glock 40 10-mm firearm in this case and said it was functioning as a semi-automatic firearm, "[i]t fired one [round] with each pull of the trigger."

William Talacko is a forensic technician with OPD. He test-fired the Glock 17 9-mm firearm in this case and said it "was found to fire in a full-auto capacity, which is to say that one pull of the trigger expelled multiple rounds." According to Talacko, "The Glock 17 model is manufactured . . . as a semi-automatic firearm," and "[a]lterations have to be made to the firearm in order to make it fire full-auto." In this case, the modification was a "switch," a "stainless steel-looking part that extends out of the back of what's called the slide -- the top half of the gun." "One direction of the switch is designed to fire the firearm in its standard, semi-automatic capacity, and then the other direction is designed to activate that full-auto functionality." When the switch is in the full-auto position, "if we were to load up an entire magazine and pull the trigger one time, it would expel all of those rounds at a fast rate of speed."

The parties stipulated that Felix was previously convicted of a felony and was a convicted felon on March 6, 2023.

After both parties rested their cases, the district court denied Felix's motion for a directed verdict.

The jury found Felix guilty of counts 1 and 2 (possession of a firearm by prohibited person) and count 3 (possession of a machine gun). The district court entered judgment on the verdicts on April 24, 2024. Felix's subsequent motion for new trial was denied.

An enhancement hearing was held on June 4, 2024, and the district court found Felix was a habitual criminal for purposes of sentencing. The sentencing hearing was then held on July 2. The court found that Felix had previously been convicted of possession of a firearm by a prohibited person, therefore the convictions for counts 1 and 2 (possession of a firearm by prohibited person)

in this case were deemed second offense convictions. The court then sentenced Felix to consecutive sentences of 30 to 50 years' imprisonment on counts 1 and 2, and a concurrent sentence of 10 to 20 years' imprisonment on count 3 (possession of a machine gun). He was given credit for 272 days' time served.

Felix appeals.

## III. ASSIGNMENTS OF ERROR

Felix assigns that (1) the evidence was not sufficient to sustain his convictions and the district court erred in denying his motion for a directed verdict and (2) the district court erred in denying his motion for a new trial. He also claims that (3) he was denied his right to effective assistance of counsel because trial counsel failed to (a) "properly retain an expert witness to challenge DNA," (b) "object and introduced hearsay testimony made through Detectives Wasmund and Haniszewski," (c) "elicit testimony or provide evidence to explain DNA transfer on the 10-mm Glock," and (d) "object to the admission of evidence where the State failed to establish an unbroken chain of custody."

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Kilmer*, 318 Neb. 148, 13 N.W.3d 717 (2024). The relevant question in reviewing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court applies a de novo standard when reviewing a trial court's dismissal of a motion for new trial without conducting an evidentiary hearing, but it applies an abuse of discretion standard of review to appeals from motions for new trial denied after an evidentiary hearing. *State v. Garcia*, 318 Neb. 228, 14 N.W.3d 525 (2024).

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Felix contends that the evidence presented at trial was not sufficient to support his convictions and that the district court erred in denying his motion for a directed verdict. However, as explained below, we find that the evidence was sufficient to support all three of Felix's convictions. Accordingly, a directed verdict was not warranted.

(a) Possession of Deadly Weapon by Prohibited Person

Section 28-1206(1) states in relevant part, "A person commits the offense of possession of a deadly weapon by a prohibited person if he or she: (a) Possesses a firearm, a knife, or brass or iron knuckles and he or she: (i) Has previously been convicted of a felony[.]" The parties stipulated that Felix was previously convicted of a felony. Thus, as relevant here, the remaining question is whether a rational fact finder could have determined that Felix was in possession of the two firearms.

Actual possession is synonymous with physical possession. *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021). Constructive possession, in contrast, may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same. *Id.* The doctrine of constructive possession has been extended to the crime of possession of a firearm by a felon under § 28-1206. *State v. Sherrod*, 27 Neb. App. 435, 932 N.W.2d 880 (2019). Constructive possession may be proved by direct or circumstantial evidence and may be shown by the accused's proximity to the item at the time of the arrest or by a showing of dominion over it. *State v. Warlick, supra.*

Felix argues that there was "no direct link between [him] and the weapons" in this case. Brief for appellant at 12. He also questions the DNA evidence, arguing that "[e]ven if [his] DNA was present, the analysis could not definitively pinpoint the source of the DNA with certainty." *Id.* However, Felix's arguments go to the weight and credibility of the evidence. See *State v. Kilmer, supra* (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact).

Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Felix's convictions for two counts of possession of a deadly weapon (firearm) by a prohibited person--one count for the Glock 9-mm handgun and one count for the Glock 10-mm handgun.

Detectives Haniszewski and Vail both testified that they observed the Glock 9-mm handgun under Felix when he was being apprehended near the black Ford Mustang. Additionally, Atencio, the forensic DNA analyst, testified that Felix was not excluded as a "minor contributor" to the DNA profile from the 9-mm handgun and that the profile was "at least 23.7 billion -- which has 9 zeros -- times more likely if it originated from . . . Felix and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals." When viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have found the essential elements of the crime of possession of a firearm by a prohibited person beyond a reasonable doubt.

Detective Perry testified that he found the Glock 10-mm handgun in a plastic bag in the closet of the residence, and that a traffic citation issued to Felix was also found in the bag. Additionally, Atencio testified that Felix was not excluded as the "major contributor" to the DNA profile from the 10-mm handgun and that the profile was "at least 350 septillion -- which has 24 zeros -- times more likely if it originated from . . . Felix and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals." When viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have

found the essential elements of the crime of possession of a firearm by a prohibited person beyond a reasonable doubt.

### (b) Possession of Machine Gun

Pursuant to § 28-1203(1), "Any person or persons who shall transport or possess any machine gun, short rifle, or short shotgun commits a Class IV felony." "Machine gun means any firearm, whatever its size and usual designation, that shoots automatically more than one shot, without manual reloading, by a single function of the trigger." Neb. Rev. Stat. § 28-1201(7) (Cum. Supp. 2022).

We have already found that there was sufficient evidence to find that Felix was in possession of the Glock 9-mm handgun. Forensic technician Talacko testified that the Glock 9-mm handgun had been modified with a "switch" that allowed it to fire in a "full-auto capacity." And when the switch is in the full-auto position, "if we were to load up an entire magazine and pull the trigger one time, it would expel all of those rounds at a fast rate of speed."

Felix claims that the State failed to prove that the gun was "actually a machine gun" because it "did not clarify whether the modification was permanent, which is crucial to the legal classification of the firearm as a machine gun." Brief for appellant at 13. However, his claim that the modification had to be "permanent" for the gun to "actually be a machine gun," see *id.*, is not supported by a plain reading of the statutes, and he cites us to no other authority to support his claim. Talacko himself test-fired the Glock 9-mm firearm in this case and said it "was found to fire in a full-auto capacity, which is to say that one pull of the trigger expelled multiple rounds." When viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have found the essential elements of the crime of possession of a machine gun beyond a reasonable doubt.

### 2. MOTION FOR NEW TRIAL

Felix's motion for new trial was based on the following grounds:

1. Irregularity in the proceedings of the court, prosecuting attorney, or of the witnesses for the [S]tate or in any order of the court or abuse of discretion by which the defendant was prevented from having a fair trial;

2. The verdict is not sustained by sufficient evidence or is contrary to law.

At the hearing on the motion, Felix's trial counsel argued that "the backdrop or the foundation laid by the State -- the shooting -- I felt was quite prejudicial to my client." And "Detective Wasmund testified about a hearsay statement regarding the, I guess, the resident of the house where the second gun was recovered -- a statement that basically my client was her boyfriend"; "I felt that that was prejudicial in the sense that it would indicate that it was his gun."

The district court noted that there were no objections at trial to the testimony about the relationship between the resident and Felix. And as to "the other matter," the court "[did not] find that there was any prejudice to [Felix] in the way those questions were posed by either the State or the defendant." The court denied the motion for new trial.

In his brief on appeal, Felix argues that "the cumulative effect of the court's errors-including the admission of hearsay testimony, unreliable firearm and DNA evidence, and

the denial of the directed verdict motion . . . deprived [him] of a fair trial." Brief for appellant at 20.

We have already determined that there was sufficient evidence to support Felix's convictions and therefore a directed verdict was not warranted. As noted by the district court, Felix did not object at trial to any alleged hearsay testimony by Detective Wasmund regarding Felix's relationship with the resident of the house. See *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023) (litigant's failure to make timely objection waives right to assert prejudicial error on appeal.) And at the hearing on his motion for new trial, Felix did not raise the issue of "unreliable firearm and DNA evidence" to the district court. See *id.* (when issue is raised for first time in appellate court, it will be disregarded inasmuch as lower court cannot commit error in resolving issue never presented and submitted to it for disposition). For the foregoing reasons, the motion for new trial was properly denied.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Felix's appellate counsel is different from his trial counsel. Felix assigns that his trial counsel was ineffective because counsel failed to (1) "properly retain an expert witness to challenge DNA," (2) "object and introduced hearsay testimony made through Detectives Wasmund and Haniszewski," (3) "elicit testimony or provide evidence to explain DNA transfer on the 10-mm Glock," and (4) "object to the admission of evidence where the State failed to establish an unbroken chain of custody." Brief for appellant at 5.

### (a) General Principles of Law

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Collins*, 307 Neb. 581, 950 N.W.2d 89 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not

equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

With these standards and general principles in place, we turn to the claims alleged by Felix.

### (b) DNA Expert

Felix claims that his trial counsel was ineffective for failing to properly retain an expert witness to challenge DNA.

On December 29, 2023, Felix's trial counsel filed a motion to conduct additional DNA testing on the firearms and alleged that a named testing facility estimated that the process would take 4 to 6 weeks. Counsel also asked the district court to enter an order reducing Felix's bond by $2,894 and releasing the funds to the named testing facility. At a hearing on January 3, 2024, trial counsel requested a continuance of the trial scheduled for January 29 due to the anticipated need of 4 to 6 weeks for the DNA testing. The district court continued the trial to April 22. It subsequently granted Felix's motion for DNA testing and reduced Felix's bond and released the funds to the testing facility as requested.

Felix argues that "[d]espite trial counsel's assertions, no expert on DNA was hired or presented during trial, which represents a critical deficiency." Brief for appellant at 15. And "[h]ad a DNA expert been hired, they could have questioned the handling of the evidence, the possibility of cross-contamination, or the likelihood of innocent transfer," and "could have provided insight into the statistical significance of the DNA match." *Id.* at 16. "Without an expert to provide context, explain the limitations of DNA evidence, and offer alternative explanations for its presence, the jury was left to rely solely on the prosecution's potentially flawed interpretation." *Id.*

In response, the State argues that the record establishes that Felix retained a DNA expert with the funds from his bond reduction; it appears to rely on the fact that the district court's order reduced Felix's bond and ordered the funds to be released directly to the named facility. According to the State, "[t]he logical conclusion is that, because Felix did not present evidence at trial, his retained expert confirmed-or at least did not refute-the State's DNA analysis." Brief for appellee at 19. Alternatively, the State argues that the record is insufficient to resolve the issue on direct appeal.

Although the district court did order the funds from Felix's bond reduction to be released directly to a named testing facility, the record before us does not affirmatively establish that the additional DNA testing was actually conducted. As such, we cannot reach the "logical conclusion" suggested by the State, that the testing either confirmed or did not refute the State's DNA analysis. We therefore find that the record is not sufficient to address this claim of ineffective assistance of trial counsel on direct appeal, and it is preserved for postconviction review.

### (c) Testimony of Detectives

Felix claims that trial counsel was ineffective for "elicit[ing] hearsay statements" and "not properly object[ing] to" hearsay testimony made through Detectives Wasmund and Haniszewski. Brief for appellant at 17. Specifically, he takes issue with their testimony that Sellers-Bryant stated that she and Felix were involved in a romantic relationship. Felix argues that "[t]his testimony is

significant in that it links [him] directly to the 10mm Glock found inside the residence." *Id.* He further argues that the hearsay testimony from the detectives violated his right to confront a witness because Sellers-Bryant did not testify at trial.

However, as noted by the State, "Felix cannot establish prejudice here because, assuming for the sake of argument that this testimony would have been excluded, the remaining evidence would have been more than sufficient to convict Felix of Possession of a Firearm by a Prohibited Person." Brief for appellee at 20. The evidence at trial was that the Glock 10-mm handgun was found in a plastic bag in the closet of the residence, and a traffic citation issued to Felix was also found in the bag. Additionally, Felix was not excluded as the "major contributor" to the DNA profile from the 10-mm handgun and the profile was "at least 350 septillion -- which has 24 zeros -- times more likely if it originated from . . . Felix and three unknown, unrelated individuals than if it originated from four unknown, unrelated individuals." Because Felix was not prejudiced by any hearsay testimony about his relationship with Sellers-Bryant, this claim of ineffective assistance of trial counsel fails.

### (d) DNA Transfer

Felix claims that trial counsel was ineffective for failing to elicit testimony or provide evidence to explain DNA transfer on the Glock 10-mm handgun. He argues that "[t]he presence of Felix's DNA on the firearm could have been explained by the fact that Sellers, who owned the firearm, had access to Felix's clothing" and "[t]his transfer of DNA could have occurred in a non-criminal context, such as through incidental contact or routine handling of Felix's clothing." Brief for appellant at 18.

Initially we note that the record did not establish who owned the Glock 10-mm handgun. Additionally, Felix's trial counsel did elicit testimony about DNA transfer during the cross-examination of forensic analysis Atencio.

Q [Trial Counsel]. . . . So with reference to touch DNA, based off your training and experience, possibly these conferences, it is possible for an individual's DNA to end up on an item that they've never touched?

A [Atencio]. It is possible, but there's lots of variables, again, that come into play when we're dealing with transfer and touch DNA.

Q. So variability aside, I'm going to give you a series of explanations or scenarios which realistically could probably be exponentially interchanged. If you have someone's DNA on a gun, there's a possibility that they literally were holding the gun; is that correct?

A. Right.

Q. There's an additional possibility that perhaps they shook hands with someone who then held the gun?

A. How long did they shake hands?

Q. I'm not sure. I'm just saying is that a possibility?

A. Again, like we talked about, there's variables. It depends on that. With each transfer, we're losing DNA. So if someone shook hands very briefly, then they went and touched the firearm, there would be a lot more of that person that directly contacted the firearm versus someone that just briefly shook hands with somebody else and then touched the gun.

Q. What about more intimate contact for lack of a better term, like, if someone is embracing someone or hugging them, maybe even engaging in coitus or sexual intercourse, would that be a scenario where, provided the duration, there would be a possibility of DNA transfer to that person?

A. Right. It would depend on duration, did they wash their hands after, how long did they hug -- yes. All of that would come into play.

Q. The last scenario I want to ask you about would be somebody touching an object which then comes into contact with another object which is then handled by a person. That last person did not touch the first item, but they touched the second item. Is it possible for that last individual to have the DNA of the first individual by way of a transfer?

A. Again, it depends on the surface. Were they actively being rubbed against each other? Were they soft surfaces? Were they hard surfaces? So because of not necessarily knowing those, I don't know if I can say necessarily with certainty that that would be possible.

Q. Absolutely. So admittedly, when we're doing these types of analysis, as far as with transfer DNA, it's really impossible to know outside of a scenario where this is entirely laboratory-simulated, for lack of a better term?

A. Sure.

Q. And unless you were present when an item is introduced into an environment and you had familiarity with the environmental conditions, you could not know for sure how the DNA got there; is that correct?

A. Right.

Because trial counsel did elicit testimony to explain DNA transfer, this claim of ineffective assistance of trial counsel fails.

### (e) Chain of Custody

Felix claims that trial counsel was ineffective for failing to object to the admissibility of the firearms and DNA evidence where the State failed to establish an unbroken chain of custody. He argues that

[t]he firearms were not properly logged at several points in the process, and there were unexplained gaps during which the evidence was not accounted for or properly documented. These deficiencies in the chain of custody introduce the real possibility that the evidence could have been tampered with or mishandled. This possibility casts serious doubt on the authenticity and integrity of the firearms and DNA evidence presented at trial.

Had trial counsel properly objected to the admissibility of this evidence, the court would have been forced to consider the significant gaps in the chain of custody, which would . . . likely have led to the exclusion of the evidence.

Brief for appellant at 19.

The record reveals that Detective Haniszewski grabbed the Glock 9-mm firearm from under Felix and then "tossed it behind us just out of reach of everybody." Detective Perry picked

- 12 -

the firearm up off the ground and put it on the hood of the Mustang. Then Detective Vail took the firearm and placed it in his vehicle until the forensics unit could recover it.

Detective Perry subsequently found the Glock 10-mm firearm inside a bag that was hanging in the bedroom closet. He put the bag on the bed. He was present when forensics came and collected the evidence.

Forensic trainee Miller was dispatched to the scene, where she collected the two firearms. When she returned to the forensics laboratory, she "booked" the two firearms in, collected DNA swabs for both firearms, and sealed the swabs in evidence packaging and booked them into evidence.

The parties stipulated that on March 6, 2023, Miller collected swabs for possible DNA on both firearms, the swabs were sealed in evidence packaging, and they were then taken in that sealed packaging to the UNMC DNA Lab for testing; the swabs (in the still-sealed evidence packaging) were subsequently received by Atencio on September 28 at the UNMC DNA Lab.

Detective Wasmund testified that after he collected a buccal swab from Felix at the Douglas County Jail on September 28, 2023, he packaged and sealed the swab, transported it back to OPD Headquarters, and "booked it into OPD property." He subsequently checked out the DNA swab from OPD property and personally transported it to the UNMC laboratory and "handed it over" to Atencio. The parties stipulated that Detective Wasmund collected a buccal swab from Felix at Douglas County Corrections on September 28, and it was taken in sealed packaging to the UNMC DNA Lab for testing; the swab (in the still-sealed evidence packaging) was received by Atencio that same day.

Atencio testified that Detective Wasmund brought her the evidence in this case, and she confirmed that the items were sealed properly when they arrived at the laboratory. She then tested the swabs from the 9-mm and 10-mm handguns and from Felix and generated the DNA profiles.

The record reflects that the chain of custody was established by the testimony of the witnesses and the parties' stipulations. Therefore, trial counsel was not ineffective for failing to object to the chain of custody because there was not a reasonable probability that any such objection would have been successful. As a matter of law, counsel is not ineffective for failing to make an objection that has no merit. *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787.

If at any point "[t]he firearms were not properly logged" or "there were unexplained gaps during which the evidence was not accounted for or properly documented," brief for appellant at 19, Felix does not specifically note when those allegedly occurred, thus his claim is not sufficiently alleged.

## VI. CONCLUSION

For the reasons stated above, we affirm Felix's convictions for two counts of possession of a deadly weapon (firearm) by a prohibited person and one count of possession of a machine gun. We find the record before this court is insufficient to address on direct appeal Felix's first claim of ineffective assistance of trial counsel related to retaining an expert witness to challenge DNA, and this claim is preserved for postconviction review. However, we conclude that all other claims of ineffective assistance of trial counsel raised by Felix on direct appeal fail.

AFFIRMED.