Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/24/2025 09:08 AM CDT

State of Nebraska, appellee, v.
Amy Nejezchleb, appellant.

___ N.W.3d ___

Filed June 17, 2025.    No. A-24-696.

1. **Trial: Appeal and Error.** An issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal.

2. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Trial: Evidence: Appeal and Error.** On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial. Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal.

6. **Trial: Waiver: Appeal and Error.** A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal.

7. **Appeal and Error.** An appellate court will not consider an argument or theory that is raised for the first time on appeal. Thus, when an issue is

raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

8. **Bad Checks: Intent: Fraud.** To be found guilty of issuing a bad check, an intent to defraud must exist at the time an individual issues the insufficient-fund check.

9. **Convictions: Judgments.** The plain language of Neb. Rev. Stat. § 29-2292(1) (Cum. Supp. 2024) requires that the defendant be found guilty before making a request of the court to defer the entry of the judgment of conviction.

10. **Sentences: Appeal and Error.** When sentences imposed within statutory limits are alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering well-established factors and any applicable legal principles.

11. **Criminal Law: Courts: Sentences.** Under Neb. Rev. Stat. § 29-2292 (Cum. Supp. 2024), after a defendant is found guilty, the final disposition of the criminal case remains with the sentencing court and subject to its discretion. At each stage of the deferred judgment process, the parties can present their arguments to the court, but the sentencing decision remains with the court.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Caroline E. Sojka for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

After a bench trial in the district court for Douglas County, Amy Nejezchleb was convicted of one count of issuing a bad check, $5,000 or more, and was sentenced to 2 years' probation. Nejezchleb appeals and assigns error to an evidentiary ruling, the sufficiency of the evidence to support her conviction, and her sentence. For the reasons that follow, we affirm.

## II. BACKGROUND

On November 6, 2023, the State filed an information charging Nejezchleb with one count of issuing a bad check, $5,000 or more, a Class IIA felony. The charge arose from an incident that occurred on May 27, 2023, wherein Nejezchleb purchased several items from Bravadas, a wig and hair restoration store in Omaha, Nebraska. Nejezchleb wrote a check to Bravadas for $5,817.89 from her Centris Federal Credit Union (Centris) checking account. A few days later, Bravadas' bank returned the check due to insufficient funds in Nejezchleb's account. Employees from both Bravadas and Centris contacted Nejezchleb and informed her that the check did not clear due to insufficient funds. Nejezchleb denied that her account had insufficient funds, declined to offer Bravadas a different form of payment, and did not return the items.

Trial commenced on May 13, 2024. Nejezchleb represented herself, but standby counsel was appointed for her. The evidence adduced at trial consisted of testimony from the Bravadas store manager and store owner, the police officer who responded to Bravadas' fraud report, the investigating detective, several Centris employees, and Nejezchleb. The State offered several exhibits into evidence, including a copy of the tendered check; a copy of the Bravadas sales receipt; photographs of the items sold to Nejezchleb; a notice from Bravadas' bank that the check was not processed due to insufficient funds; Nejezchleb's banking statements from April, May, and June 2023; and several Centris records, notes, and notices concerning Nejezchleb's banking account and activity.

Jenny Lambert is the Bravadas store manager and was working on May 27, 2023, when Nejezchleb visited the store. Lambert testified that she helped Nejezchleb try on several wigs and estimated that her interaction with Nejezchleb lasted for roughly an hour. Once Nejezchleb was satisfied with her selections, Lambert conducted the final sale.

Lambert testified that Nejezchleb purchased three wigs and some assorted wig accessories. Nejezchleb's subtotal was

$5,450.36, which included $200 in tips Nejezchleb left for Lambert and another Bravadas employee. Lambert explained that depending on the style, brand, and type of hair used (synthetic versus human), wigs could vary drastically in price. One of the human-hair wigs Nejezchleb purchased was priced at $2,699.

After taxes were applied, Nejezchleb's grand total was $5,817.89. Nejezchleb provided payment in the form of a check. At that time, Bravadas' store policy was to confirm that all necessary information was listed on the check and to write the customer's phone number and driver's license number on the check. Nejezchleb complied with this policy. The sales receipt Bravadas provided to Nejezchleb included the store's exchange and return policy, which stated that unsatisfied customers could exchange or return unused items within 2 days of the purchase date.

On June 6, 2023, Lambert was notified that Nejezchleb's check was returned due to insufficient funds in her account. The following day, Lambert called Nejezchleb with the phone number provided on the tendered check. Lambert informed Nejezchleb of the returned check and requested a new form of payment. Nejezchleb claimed that the products she purchased were defective and that the returned check was a refund. Lambert told Nejezchleb that if she desired a refund, she needed to abide by the store's return policy and return the products. Nejezchleb responded that the store was in the wrong and hung up. Lambert then contacted Scott Stark, the Bravadas store owner.

Stark testified that after Lambert informed him of the situation, he called Nejezchleb himself. Stark testified that Nejezchleb told him that he was bothering her, that the problem had been solved, and that he needed to forget about it and move on. Nejezchleb then hung up. Stark attempted to call Nejezchleb back to no avail.

At some point thereafter, Bravadas contacted the Omaha Police Department. On June 23, 2023, a police officer was

dispatched to the store and took a statement from Lambert. Lambert provided the officer with the tendered check and the itemized sales receipt.

Det. Kelly Nownes was assigned to the case on June 28, 2023. Nownes issued subpoenas to Centris for Nejezchleb's account statements dating back to April 2023 and for internal communications and records concerning Nejezchleb's account activity. Nownes also contacted Nejezchleb on July 7 and explained that she was investigating the returned check. Nejezchleb asserted that the check had cleared. Nownes responded that Nejezchleb's bank records showed otherwise. Nownes informed Nejezchleb that if the situation were resolved quickly, a warrant for her arrest would not be issued. Nejezchleb laughed and said, "I don't think so," and then she hung up. A warrant for Nejezchleb's arrest was subsequently issued and executed.

Jason Soma, a financial services representative for Centris, testified that in April 2023, he assisted Nejezchleb in setting up a checking and savings account. Soma testified that when members open new accounts, they are informed of Centris' overdraft policies. One such policy is when a transaction triggers an overdraft or nonsufficient funds alert, a fee is assessed to the member's account and an expectation arises that the account will be "brought back [to] current."

On May 24, 2023, Nejezchleb contacted Soma to discuss several $35 nonsufficient funds fees assessed to her account. Soma reviewed Nejezchleb's account transactions to ensure that no fraud appeared on her account and that all transactions were legitimate. Because her account was only 1 month old, Soma was able to analyze Nejezchleb's entire account history. At that time, she had a negative balance of roughly $359. Nejezchleb confirmed that every transaction was legitimate but insisted that there should have been a positive balance in her account. Soma informed her that to the contrary, there was no money in the account. Three days later, Nejezchleb wrote the check to Bravadas.

Ashley Goodsell, a fraud analyst at Centris, became familiar with Nejezchleb on June 5, 2023. The Centris payment department reached out to Goodsell because there were two checks with large dollar amounts attempting to clear through Nejezchleb's account, which had a negative balance. The first check was made out to Bravadas, and the second check was a "self-to-self check" totaling $500,000. The "self-to-self check" was written by Nejezchleb to herself.

Goodsell confirmed that Nejezchleb's account had a negative balance of over $350. Goodsell then performed a "holistic review" of Nejezchleb's account, reviewing information such as Nejezchleb's normal account balance, how often she was in overdraft, how often she contacted the bank, and how often she accessed online banking services. Goodsell testified that when a member accesses online banking services, it indicates that the member is aware of his or her balance. Based on Nejezchleb's online banking activity, Goodsell described her as an "active member," meaning she accessed online banking services once every 2 to 5 days.

After reviewing this information, Goodsell called Nejezchleb to obtain a deeper understanding of her account activity. Goodsell described the phone call as "very short." Goodsell identified herself as a fraud analyst for Centris, confirmed that she was speaking to Nejezchleb, and described the concerning check activity on Nejezchleb's account. Nejezchleb responded that she had already discussed the matter with Soma and that he was "taking care of it." Goodsell attempted to emphasize the seriousness of the matter when Nejezchleb began laughing and hung up. Goodsell then reached out to Soma. Soma stated that he had informed Nejezchleb of her overdraft status and noted that Nejezchleb was adamant that Centris was somehow at fault for her negative balance.

Goodsell wrote an evaluation detailing her research and her concern that Nejezchleb was abusing her account in such a way that could cause financial loss to Centris. Goodsell recommended that Nejezchleb's account be placed on "limited

services" status for abusive conduct. Limited services status results in members losing their cards, losing the ability to write checks from checking accounts, and losing access to online banking. Further, any positive balance that remains in a member's checking account is transferred to a savings account. Nejezchleb was ultimately placed on limited services. Goodsell notified Nejezchleb of her limited services status on June 5, 2023, via letter.

Nejezchleb testified in her defense, and she admitted to writing the check to Bravadas for $5,817.89. She testified that when she issued the check to Bravadas, she believed she had more money in her account than what her account statements reflected. She continued to hold this belief at the time of trial.

Nejezchleb testified that a few days after she wrote the check to Bravadas, she wrote a second check to another store for $3,000, which passed the "automatic check reader" machine. Nejezchleb testified that because this second check "went through," she believed she had the necessary funds in her account to cover both check amounts. She offered the second check as an exhibit, which was received by the court without objection.

Nejezchleb generally recalled having a conversation with Soma in late May 2023 about balancing her account, but she did not recall Soma mentioning an issue of insufficient funds. Nejezchleb also recalled her conversation with Goodsell, including their discussion of the two checks that were not clearing due to insufficient funds in her account. At the time of trial, Nejezchleb had not made any attempt to pay Bravadas the amount due, nor had she returned any of the wigs or accessories.

The court ultimately found Nejezchleb guilty of issuing a bad check, $5,000 or more. The court ordered a presentence investigation report (PSR) and scheduled the matter for sentencing.

The PSR revealed that at the time of sentencing, Nejezchleb was 44 years old. The report indicates that Nejezchleb is a

highly educated person and has worked in several academic settings. According to her curriculum vitae, she has a master's degree and a doctorate degree in English.

Nejezchleb was previously employed at Bellevue University as a writing center coordinator and an adjunct faculty member. In August 2021, she was fired from the university due to a disagreement she had with the dean. Thereafter, Nejezchleb falsely announced online that she was the university's new president and attempted to hire new employees for the school.

Nejezchleb has two children who live with their father, who is her ex-husband. In December 2021, Nejezchleb's ex-husband filed a motion requesting temporary care, custody, and control over their minor children. In the motion, he alleged that Nejezchleb believed that she was being recruited by the Central Intelligence Agency. He further alleged that Nejezchleb had a premonition that he had died and told their children that he was dead, which caused them distress. His motion was granted, and in later proceedings, he was granted sole legal and physical custody of the children. In June 2024, he sought a harassment protection order against Nejezchleb.

Nejezchleb has no prior criminal history. However, in December 2021, she had at least four police interactions wherein she exhibited concerning and delusional behavior. Each of these incidents occurred at Bellevue University, and as a result, Nejezchleb was banned and barred from the premises. Several criminal cases arose from these incidents in Sarpy County, but in February 2022, Nejezchleb was found not competent to stand trial. She was committed to a psychiatric hospital for inpatient treatment. In June 2022, Nejezchleb was deemed competent, but the cases were not pursued by the State.

Nejezchleb's overall test scores indicated she had a low risk of recidivism. However, her behavioral test scores revealed that she tends to be defensive and guarded regarding self-disclosure, thus creating the possibility of distorted test results. The behavioral test scores also showed that

Nejezchleb exhibited antisocial behavior and struggled with truthfulness. As a result of her mental health screening, the probation office recommended further consultation with mental health professionals.

Nejezchleb reported a history of stress, suicidal ideations, and insomnia. The report indicates that Nejezchleb minimized her health problems and denied experiencing delusions. Nevertheless, in an effort to reunite with her children, Nejezchleb expressed a willingness to engage in medication management and counseling services.

In her statement regarding the current offense, Nejezchleb maintained her innocence. She continued to assert that there were or should have been sufficient funds in her account to clear the check she tendered to Bravadas. However, she admitted that she received several notifications concerning her account's insufficient funds to satisfy the check.

The probation office ultimately recommended a sentence of probation. The report emphasized that Nejezchleb should avail herself of treatment interventions to assist her in living a successful life. However, it was noted that Nejezchleb's tendencies to deny and minimize her mental health struggles could make it difficult for her to receive therapeutic treatment.

At sentencing, Nejezchleb was represented by counsel and asked the court to defer the entry of judgment of conviction. The State argued against a deferred judgment due to Nejezchleb's failure to take accountability for her actions. The matter was then submitted to the court.

The district court stated that it had reviewed the PSR and considered the relevant sentencing factors. The court specifically noted that Nejezchleb did not have any prior criminal convictions and that the present offense did not involve any violence, guns, or drugs. The court then made the following remarks:

> [I]t's going to be my finding that I am going to place you on probation. I don't find you as a good candidate for deferred probation though. Yes, you have a right to

a trial. But I see deferred probation, and when I read the statutes, as something somebody avails themselves of prior to trial. I certainly don't hold it against you that you had a trial. I think that's your right, and I'm here for that reason. But there are some concerns out of the [PSR]. And also I don't believe, in my opinion, it would be appropriate to put you on deferred probation that is; lack of accountability and responsibility and what have you.

The court sentenced Nejezchleb to 2 years' probation. Nejezchleb appeals.

### III. ASSIGNMENTS OF ERROR

Nejezchleb assigns that (1) the district court erred in admitting business records because the certifications were testimonial and violated the Confrontation Clause, (2) the evidence presented at trial was insufficient to support her conviction, and (3) the district court abused its discretion by not imposing a sentence of deferred judgment probation.

### IV. STANDARD OF REVIEW

[1] An issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal. *State v. Yah*, 317 Neb. 730, 11 N.W.3d 632 (2024).

[2] In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *Id.* The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

[3,4] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). An abuse of discretion occurs when a trial court's

decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. Evidentiary Ruling

#### (a) Additional Background

Before trial, the State motioned for "notice of intent" to offer business records evidence pursuant to Neb. Rev. Stat. §§ 27-803(6)(a) and 27-902(11) (Cum. Supp. 2024). At a hearing on the motion, the State offered exhibits 1 through 14 as business records. Exhibits 1, 6, and 12 were affidavits from a records document processor for Centris, regarding the documents Centris provided in response to the police subpoenas. Exhibit 8 was the affidavit of an employee of Security National Bank, which stated that the records the bank provided were kept in the course of regularly conducted business activity. The remaining business records exhibits offered by the State included Nejezchleb's banking statements and records from April and May 2023, Centris' internal banking records and notes concerning Nejezchleb's account, notices sent to Nejezchleb concerning her banking activity and status, a copy of the check written by Nejezchleb to Bravadas, and a notice sent from Security National Bank to Bravadas that Nejezchleb's check was not processed due to insufficient funds.

Nejezchleb represented herself at the hearing and confirmed that she had an opportunity to review the exhibits. She raised objections to exhibit 5, the report written by Goodsell concerning Nejezchleb's account activity. The report detailed events, including Nejezchleb's check history, which eventually led to placing Nejezchleb on limited services status. Nejezchleb objected to this exhibit because it mentioned a bank account she used to share with her ex-husband. Nejezchleb elaborated that she was also

> objecting under the reason of 404(b), evidence of other cases or wrongs that are currently in process within

Douglas County. I would also like to object based on Federal Rule for Evidence 704(b), which is with respect to the mental state or condition of the . . . case. Later in this record, it says stuff about aggressive behavior.

The district court noted that while the Federal Rules of Evidence were not applicable in this case, it was likely that there were similar, applicable state rules. Thus, the court took the matter under advisement to review the applicable Nebraska Evidence Rules. The court ultimately entered an order overruling Nejezchleb's objection to exhibit 5. The court received exhibits 1 through 14 into evidence for purposes of being used at trial pursuant to §§ 27-803(6)(a) and 27-902(1l).

At trial, Nejezchleb objected to several of the State's exhibits. She again raised her pretrial objections to exhibit 5, which were overruled. She objected to exhibit 2, a form she filled out in April 2023 to open a new account with Centris. On the form, Nejezchleb's employer is listed as Bellevue University and her occupation is listed as writing center coordinator. Nejezchleb argued that the form was not a fair and accurate representation of her application. She explained that during the application process, she stated that she was not truly employed by Bellevue University or working as a writing center coordinator. The court received the exhibit over her objections and indicated that she could cross-examine the witness on that issue.

Exhibit 13 consisted of notes from Centris' internal database concerning Nejezchleb's account and transactions. Nejezchleb objected to this exhibit "as a result of inadmissibility." The court overruled the objection and received the exhibit.

Exhibit 31 was Nejezchleb's June 2023 checking account statement. Nejezchleb objected to this exhibit because the State did not offer it as a business record at the pretrial hearing. The court overruled that objection and asked if Nejezchleb had any other objections. Nejezchleb did not, and the exhibit was received.

Exhibit 33 was a record of Nejezchleb's online banking activity. Nejezchleb's standby counsel objected to this exhibit and argued that the document the State offered was not the same document that was provided to Nejezchleb prior to trial. On this basis, the court did not receive exhibit 33.

### (b) Analysis

Nejezchleb argues that the district court erred in admitting the business records because the affidavits used to certify the records, exhibits 1, 6, 8, and 12, were testimonial and violated the Confrontation Clause. Nejezchleb specifically asserts that because she was not given an opportunity to cross-examine the witnesses who authored the affidavits, her right to confront these individuals was violated. The State counters that this assignment of error is not properly preserved for appellate review because during the proceedings below, Nejezchleb did not object to any exhibits on Confrontation Clause grounds. After reviewing the record, we agree with the State.

[5] On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal. *Id.*

Nejezchleb's argument concerning the admission of the business records, in violation of the Confrontation Clause, is not properly before us because the issue was not presented to the district court. Nejezchleb did not object to exhibits 1, 6, 8, or 12 at the pretrial hearing or at trial. Further, at no point in the proceedings below did she request an opportunity to confront the witnesses who authored those affidavits.

Although Nejezchleb did raise objections to some of the business records, a careful review of those objections reveals that not one was based upon the Confrontation Clause.

Nejezchleb objected to exhibit 2 based on her contention that the employment information contained therein was inaccurate. She objected to exhibit 5 based on its references to a prior bank account, a separate case, and "behavior." Her objection to exhibit 13 was nothing more than a vague assertion of inadmissibility. These objections did not raise Confrontation Clause issues.

[6,7] A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023). An appellate court will not consider an argument or theory that is raised for the first time on appeal. *Id.* Thus, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *Id.* We conclude that Nejezchleb failed to preserve this issue for appellate review.

## 2. Sufficiency of Evidence

Nejezchleb argues that the evidence presented at trial was insufficient to find her guilty of issuing a bad check, $5,000 or more, beyond a reasonable doubt. She specifically argues that there was insufficient testimony to show that she had knowledge of insufficient funds in her bank account.

In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Yah*, 317 Neb. 730, 11 N.W.3d 632 (2024). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Neb. Rev. Stat. § 28-611(1) (Cum. Supp. 2024) states:

Whoever obtains property, services, . . . or present value of any kind by issuing or passing a check . . . for the

payment of money, knowing that he or she does not have
sufficient funds in or credit with the drawee for the pay-
ment of the check . . . commits the offense of issuing a
bad check.

If the amount of the check is $5,000 or more, the offense is
a Class IIA felony. See § 28-611(1)(a). Because Nejezchleb
contests only the State's evidence regarding her knowledge of
insufficient funds, we, too, focus our analysis on this element.

[8] An intent to defraud must exist at the time an individual
issues an insufficient-fund check. See *State v. Hruza*, 223 Neb.
837, 394 N.W.2d 643 (1986). In any prosecution for issuing a
bad check, the person issuing the check shall be presumed to
have known that he or she did not have sufficient funds in the
drawee for the payment of the check in full upon presentation
if, within 30 days after issuance of the check, he or she was
notified that the drawee refused payment for lack of funds and
he or she failed within 10 days after such notice to make the
check good. § 28-611(6).

After reviewing the evidence in a light most favorable to
the State, we find that the evidence was sufficient to find
Nejezchleb guilty of issuing a bad check, $5,000 or more. The
State provided robust evidence demonstrating Nejezchleb's
knowledge of the insufficient funds in her account. During the
30-day period after Nejezchleb issued the check, there were
three instances where she was notified that the check was
returned due to insufficient funds.

On June 5, 2023, 9 days after Nejezchleb issued the check,
Goodsell contacted Nejezchleb to discuss her negative account
balance and the two checks that were attempting to clear her
account, one of which was the check made out to Bravadas. At
trial, Nejezchleb recalled this conversation in full. Following
this conversation, Goodsell sent Nejezchleb a notice that due
to her concerning account activity, she was placed on limited
services.

On June 7, 2023, 11 days after Nejezchleb issued the check,
the Bravadas store manager called Nejezchleb and notified

her that the check was returned due to insufficient funds. On that same day, Nejezchleb received a call from the Bravadas store owner, also notifying her about the returned check. Nejezchleb ended each of these phone calls abruptly without resolving the issue.

Nejezchleb failed "to make the check . . . good" or provide an alternative form of payment within 10 days after each notice. See § 28-611(6). Thus, under § 28-611(6), it may be presumed that Nejezchleb knew that she did not have sufficient funds for the payment of the check in full upon presentation.

But even without this statutory presumption, a fact finder could have still found that Nejezchleb knew that her account had insufficient funds to satisfy the full check amount. On May 24, 2023, 3 days before writing the check, Nejezchleb spoke with Soma to discuss several nonsufficient funds fees assessed to her account. At that time, Nejezchleb had a negative balance of roughly $359, and Soma informed Nejezchleb that there was no money in her account.

Additionally, Goodsell testified that Nejezchleb was an active online banking member, meaning that she logged onto her online account once every 2 to 5 days. Goodsell testified that when a member accesses online banking services, it indicates that the member is checking his or her account balances. Nejezchleb's account statements throughout late May and early June 2023 show that during this time, her account often had a negative balance. On May 25, 2023, her account was briefly "brought back [to] current," but that balance did not exceed $5,000. Additionally, after a series of withdrawals over the following 6 days, her account once again had a negative balance. Viewing this evidence in a light most favorable to the State, a fact finder could reasonably conclude that Nejezchleb knew prior to issuing the check to Bravadas that she did not have the sufficient funds to do so.

For these reasons, we find that there was sufficient evidence to find Nejezchleb guilty of issuing a bad check, $5,000 or more. This assignment of error is without merit.

### 3. Sentencing Determination

Nejezchleb asserts that the district court abused its discretion by not imposing a sentence of "deferred judgment probation." She argues that the court misinterpreted the deferred judgment statute and incorrectly concluded that a defendant must request deferred judgment before trial. She argues that deferred judgment can apply when a defendant pleads guilty or when a defendant proceeds to trial and is found guilty.

The State concedes that the district court remarked that a deferred judgment is "something somebody avails themselves of prior to trial." However, the State argues that it is unnecessary for this court to assess the validity of that statement because the court did not base its denial of Nejezchleb's request for a deferred judgment on the fact that Nejezchleb went to trial. Instead, the State asserts that the court based its sentencing determination on relevant sentencing factors, including Nejezchleb's failure to take accountability for the crime and concerning information contained in the PSR.

[9] Neb. Rev. Stat. § 29-2292(1) (Cum. Supp. 2024) states:

Upon a finding of guilt for which a judgment of conviction may be rendered, a defendant may request the court defer the entry of judgment of conviction. Upon such request and after giving the prosecutor and defendant the opportunity to be heard, the court may defer the entry of a judgment of conviction and the imposition of a sentence and place the defendant on probation, upon conditions as the court may require under section 29-2262.

The district court's remark that suggests a defendant should request a deferred judgment prior to trial is inaccurate. The Nebraska Supreme Court has held that the plain language of § 29-2292(1) requires that the defendant be found guilty *before* making a request of the court to defer the entry of the judgment of conviction. See *State v. Gnewuch*, 316 Neb. 47, 3 N.W.3d 295 (2024).

[10] However, our analysis does not end there. Neither party disputes that Nejezchleb's sentence of 2 years' probation

was within statutory limits. A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Thomas*, 311 Neb. 989, 977 N.W.2d 258 (2022). When sentences imposed within statutory limits are alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering well-established factors and any applicable legal principles. *Id.* A judicial abuse of discretion exists only when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[11] Under § 29-2292, after a defendant is found guilty, the final disposition of the criminal case remains with the sentencing court and subject to its discretion. *State v. Gnewuch, supra*. At each stage of the deferred judgment process, the parties can present their arguments to the court, but the sentencing decision remains with the court. *Id.* As the Supreme Court has noted, this is what happens during any sentencing hearing. *Id.*

When a court considers a request to defer judgment, it is required to consider the factors set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2016), as well as any other relevant information. § 29-2292(3). Section 29-2260 contains the same factors a court is required to consider when deciding whether to impose a sentence of probation. These factors include the amount of harm caused by the crime, substantial grounds present to excuse or justify the crime, the victim's inducement or facilitation of the crime, whether the offender compensated the victim for the damages sustained, and whether the offender's character and attitude indicates that he or she is unlikely to commit another crime.

Considering the totality of the circumstances, we cannot say that the district court abused its discretion in sentencing Nejezchleb. Before announcing the sentence, the district court explicitly stated: "I certainly don't hold it against you that you

had a trial. I think that's your right, and I'm here for that reason." The court explained that it had considered her request for a deferred judgment but ultimately determined that a sentence of probation was more appropriate due to concerns present in the PSR, as well as Nejezchleb's failure to take accountability for her actions.

We agree with the district court's assessment that information in the PSR raised concerns about Nejezchleb and her ability to function successfully in society. Although Nejezchleb does not have a criminal history, several factors weighed against a deferred judgment, including her mental health struggles; her increasingly erratic behavior; and, most importantly, her unwillingness or inability to accept responsibility in this case. At no point did Nejezchleb seek to compensate Bravadas for its losses (we acknowledge that Nejezchleb was not ordered to pay restitution in this case, but nevertheless, compensation for damages is a factor listed in § 29-2260). To the contrary, Nejezchleb's written statement provided to the probation officer stated her belief that she was innocent of any criminal wrongdoing, blaming others for her predicament. She contended that she never received proper notification that her account did not have sufficient funds to cover the check, despite the evidence demonstrating that she was repeatedly notified by Bravadas, Centris, and the police. A sentence of probation is fitting because it provides Nejezchleb with resources to address her mental health struggles and also facilitates adequate supervision to deter further unlawful conduct.

While the district court may have erred in its determination regarding the appropriate time to request a deferred judgment, it nonetheless provided other reasonable grounds to deny Nejezchleb's request for a deferred judgment. Further, Nejezchleb's sentence of 2 years' probation coincides with the recommendation of the probation office and is well below the maximum sentence of 20 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). Having found no abuse of discretion, we affirm the sentence imposed.

## VI. CONCLUSION

For the reasons set forth above, we affirm Nejezchleb's conviction and sentence.

AFFIRMED.