Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/19/2025 08:07 AM CST

**State of Nebraska, appellee, v.
Elijah E. Logan, appellant.**

___ N.W.3d ___

Filed December 19, 2025.    No. S-24-813.

1. **Rules of Evidence: Other Acts.** An appellate court will review for
   abuse of discretion a trial court's evidentiary rulings on the admissibility
   of a defendant's other crimes or bad acts under Neb. Evid. R. 404(2),
   Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024), or under the inextrica-
   bly intertwined exception to the rule.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a
   trial court's decision is based upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
3. **Jury Instructions: Appeal and Error.** Whether jury instructions are
   correct is a question of law, which an appellate court resolves indepen-
   dently of the lower court's decision.
4. **Trial: Witnesses.** The exclusion or sequestration of a witness is within
   the discretion of the trial court.
5. **Double Jeopardy: Convictions: Appeal and Error.** Whether two con-
   victions result in multiple punishments for the same offense for double
   jeopardy purposes presents a question of law, on which an appellate
   court reaches a conclusion independent of the court below.
6. **Appeal and Error.** Consideration of plain error occurs at the discretion
   of an appellate court.
7. **Rules of Evidence: Other Acts.** Under Neb. Evid. R. 404(2), Neb. Rev.
   Stat. § 27-404(2) (Cum. Supp. 2024), evidence of other crimes, wrongs,
   or acts is not admissible to prove the character of a person in order to
   show that he or she acted in conformity therewith.
8. ____: ____. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum.
   Supp. 2024), does not apply to evidence of a defendant's other
   crimes or bad acts if the evidence is inextricably intertwined with the
   charged crime.

9. ____: ____. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts. Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

10. **Jury Instructions: Appeal and Error.** The failure to provide a limiting instruction absent a request is not reversible error.

11. **Criminal Law: Trial: Evidence: Appeal and Error.** An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt.

12. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

13. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

14. **Self-Defense: Evidence: Proof.** Justifications for the use of force in self-defense are statutorily defined, and the defendant bears the initial burden to produce evidence which supports a claim of self-defense.

15. **Self-Defense: Jury Instructions.** A trial court is required to give a self-defense instruction where there is any evidence in support of a legally cognizable theory of self-defense.

16. ____: ____. Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense.

17. **Self-Defense: Jury Instructions: Evidence.** To instruct on self-defense, it is not enough that the defendant subjectively believed in the need to use force for self-protection; the defendant must produce evidence that this subjective belief was also objectively reasonable.

18. **Self-Defense.** If a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense.

19. **Trial: Witnesses: Testimony.** Generally speaking, a request for sequestration of witnesses is a request that they be excluded from the courtroom until called to testify.

20. **Trial: Witnesses.** Sequestration is based on the belief that not hearing other witnesses' testimony tends to better elicit the truth and promote the ends of justice.

21. **Trial: Witnesses: Rules of Evidence.** For purposes of Neb. Evid. R. 615(3), Neb. Rev. Stat. § 27-615(3) (Reissue 2016), a victim in a criminal case may be qualified as an essential person.

22. **Trial: Witnesses: Appeal and Error.** The denial of a sequestration motion will not be overturned absent evidence of prejudice to the defendant.

23. **Double Jeopardy.** The respective Double Jeopardy Clauses of the U.S. and Nebraska Constitutions protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.

24. **Homicide: Double Jeopardy.** Where a defendant is alternately charged with both premeditated murder and felony murder and the record is not clear under which theory the jury found the defendant guilty, then the defendant cannot be sentenced for both the murder and the predicate felony for felony murder.

25. **Sentences: Weapons.** Neb. Rev. Stat. § 28-1205 (Reissue 2016) mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed and concurrent with no other sentence.

Appeal from the District Court for Washington County: Bryan C. Meismer, Judge. Convictions affirmed, all sentences vacated, and cause remanded for resentencing.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ., and Riedmann, Chief Judge.

Cassel, J.

## INTRODUCTION

In this direct appeal, Elijah E. Logan challenges the district court's admitting evidence of his prior uncharged assaults against S.E. under the inextricably intertwined doctrine, refusing to instruct the jury on self-defense, and not sequestering S.E. Finding no error in those respects, we affirm his convictions. Logan also asserts error with respect to sentencing. Because it was error to impose sentences for both felony murder and its predicate felony and to order that certain sentences run concurrently, we vacate the sentences and remand the cause for resentencing.

## BACKGROUND

To orient a reader, we begin with a summary of the ultimate events. We follow with a summary of the proceedings regarding earlier incidents. We then detail the trial evidence. Finally, we set forth the verdicts and the sentences imposed. In the analysis section, we touch on the trial proceedings regarding sequestration.

### Events Leading to Charges

We briefly summarize the events of May 12, 2023, which led to criminal charges against Logan. On that day, Logan kicked in the door of the house where S.E., the mother of his infant child, was staying. Logan entered S.E.'s bedroom and punched her in the mouth. When S.E.'s brother, Jordan E., tried to open the door to the bedroom while armed with a gun, Logan repeatedly shot him, thereby killing him. Logan then shot S.E.'s left leg. After S.E. hopped to the child's crib and picked him up, Logan shot her other leg while she was holding their child. S.E. survived, and the child was uninjured.

As a result of these events, the State charged Logan with eight felony offenses. Count 1 charged murder in the first degree. It alleged: Logan "purposely and with deliberate and premeditated malice kill[ed] J[ordan] in violation of Neb.

Rev. Stat.[]§ 28-303(1)(2) a Class 1A Felony. Furthermore, the intentional killing was committed during the course of a felony to wit: burglary." Counts 2 through 4 alleged use of a deadly weapon—a 9-mm handgun—to commit a felony. Count 2 corresponded to the murder felony, while counts 3 and 4 corresponded to the respective felonies of domestic assault in the first degree and child abuse. Count 5 charged possession of a deadly weapon to commit the felony of burglary. Count 6 charged domestic assault in the first degree. Count 7 charged Logan with burglary. Finally, count 8 charged intentional child abuse with no serious bodily injury.

## MOTION TO ADMIT UNCHARGED
## CONDUCT

Prior to trial, the State filed two motions to admit evidence of Logan's prior uncharged acts of domestic violence against S.E. One motion sought admission under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024). The other motion sought admission of such evidence as inextricably intertwined evidence. The latter motion also sought to admit evidence of Logan's threats to and against S.E.

During a hearing on the motions, the prosecutor informed the court of his view that prior acts of domestic violence and text messages containing threats were intertwined evidence. However, he added that if the court disagreed, then the State would seek to introduce that evidence through rule 404(2). Logan's counsel stated that the defense had no objection to the admission of text messages between Logan and S.E. "under inextricably intertwined."

S.E. then testified about four episodes of domestic violence by Logan. The first occurred in late January or early February 2023 in their shared bedroom. S.E. refused to give Logan the password to her cell phone, so Logan grabbed the phone and cracked it against a window. Logan pinned S.E.'s hands above her head while sitting on top of her, screamed in her face that she should unlock the phone, and pulled her head back by her

hair. That night, Logan did not allow S.E. to leave the bedroom. He "left that window AC blasting, and he left [S.E.] no blanket [or] pillow."

The second episode occurred toward the end of February 2023 in Logan's vehicle. S.E. testified that Logan was driving and tried to push her out of the moving vehicle onto an interstate highway. At some point after he stopped the vehicle, he pushed S.E. out, and she sustained "a whole bunch of bruises."

The third episode occurred on April 16, 2023. It involved S.E.'s being upset that Logan would not open a social media application on his phone. They argued, and S.E. threatened to break Logan's video gaming system. S.E. stated that she tried to force her way into his bedroom to grab her belongings, but he pushed her back.

On cross-examination, S.E. testified about a fourth episode that occurred in the kitchen of Logan's residence. During an argument, Logan put his hands around S.E.'s throat.

The court subsequently entered an order on the State's motions to admit evidence. It believed that the prior interactions between Logan and S.E. and the nature of their relationship were "necessary for the prosecution to present a coherent picture of the charged crime." The court also stated that the relevance of the testimony was not outweighed by the potential danger of unfair prejudice or of a confused or misled jury.

## Trial Evidence

At trial, S.E. testified about her relationship with Logan. They became acquainted through a social media site in September 2021 and quickly commenced a dating relationship. At the start, they were compatible and had no issues.

In January 2022, Logan and S.E. began arguing more. The arguments were typically over social media use. S.E. would be irritated or jealous that Logan was following other females on social media sites. Amid these ongoing issues, S.E. learned in March that she was pregnant with Logan's child. The pregnancy caused more stress in the relationship because Logan

did not want to be a parent. In June, S.E. began staying "full time" at Logan's residence.

S.E. testified that after the child's birth in October 2022, the way that Logan treated her changed. According to S.E., Logan's anger "shifted," which she explained meant that he "was getting in [her] face" when they argued. Logan's counsel objected to "reraise our 404 objection that was already litigated," and the court granted counsel's request for a continuing objection. S.E. testified that Logan was getting more aggressive every time they argued. She then provided testimony about two incidents that she described during the pretrial hearing—the cold bedroom event and the kitchen choking event.

In mid-April 2023, S.E. moved out of Logan's residence following a "big argument." She and the child moved into one of the bedrooms on the main floor of her father's house in Blair, Nebraska. Jordan occupied a bedroom in the basement of the same house.

On May 5, 2023, S.E. asked Logan to watch their child so that S.E. could have a "night out." He refused, but S.E. found a family member to provide care. That evening and continuing through the early morning hours of May 6, Logan called S.E.'s phone and sent her numerous text messages. A multitude of the text messages threatened to kill her. As just one example, he sent a message saying, "[T]ell me where you're at right now and I'll come kill you right now."

Late in the evening of May 6, 2023, Logan sent another threatening text message. It stated:

Proving my point not to play with me [expletive] that's what you wanted to play and test me bud so you're gonna [expletive] find out. I am going to kill you I'm just gonna hurt you real [expletive] bad and make you suffer for the rest of your life stupid [expletive] Since that's what you want me to do[.]

He followed up with the message "Ain't even *," which we interpret to be a substitute for "am" (before "going to kill you") in the earlier message.

After exchanging a few more text messages, S.E. sent one stating that she "blocked" Logan "on everything" and was going to "block [his] number as well." Despite this message, Logan and S.E. continued exchanging messages throughout the early morning hours of the following day and continuing through May 11, 2023. The last text message from S.E., sent on the afternoon of May 11, stated:

> Here's how this is gonna go the lady is going to come over & whatever happens w that then so be it but I am going after child support & full custody since you don't want to actively be there for your son. You wanna see your son then you can take me to court otherwise you won't be seeing him. Please stop calling & texting me.

On the day of the killing, Logan left his residence in Council Bluffs, Iowa, at around 6 a.m. and headed to the home of S.E.'s father. Logan did so because he wanted to figure out what he and S.E. were going to do about their relationship and child, but he was unable to communicate with S.E. through any social media sites.

On that morning, Logan had a gun in his waistband and 30 to 31 rounds of live ammunition. But Logan testified that he had no intention of using the gun. He explained that he carried a gun every day "[j]ust for protection" and usually carried two extra magazines of ammunition.

Logan parked his vehicle behind the house of S.E.'s father. He did so because he "knew that [he and S.E.] were fighting heavily and she had probably told her dad and brother about it and they're obviously in cahoots about keeping [the child] away from [Logan]." He kicked in the front door and walked into S.E.'s bedroom. S.E. heard somebody enter her bedroom and close the bedroom door. She put on her glasses and saw that Logan was by her door. Logan asked S.E., "'How are you going to do this to me?'" As S.E. tried to leave the bedroom, Logan punched her in the mouth. The injury she sustained to her lip required four or five stitches. A doctor would

later testify that if the lip injury were left untreated, it could possibly scar and cause issues with eating or speaking.

The punch spun S.E. around, and she put her face into her bed and protected her head from further punches. Logan then hit her in the side. When S.E. tried to walk past Logan, he pushed her backward.

S.E. testified that she heard Jordan "jiggle" the bedroom doorknob. But the door was locked, so Jordan could not enter the bedroom. S.E. testified that Logan then opened the door while pulling a gun out of his waistband. When Logan opened the door, S.E. could see that Jordan was holding a gun. Logan immediately fired his gun at Jordan, and Jordan fell to the ground. S.E. testified that Logan fired his gun five times.

Logan's version of events differed somewhat. He testified that he "heard a very loud, clear, distinctive cocking of a pistol" from "the other side of that door." He turned around and drew his firearm. According to Logan, the door "fl[ew] open" and he shot his gun "from the hip . . . at an upward angle." Logan testified that when he pulled his firearm, he made the decision to defend himself.

Logan then turned to S.E. and fired three times at her left leg. S.E. hopped on one leg to the child's crib. S.E. testified that after she had picked up the child, Logan went to Jordan and shot him twice in the head. Logan denied ever shooting downward at Jordan's body. Logan then shot S.E.'s right thigh twice while she was holding their child. S.E. testified that she immediately dropped to the ground. After shooting S.E., Logan changed the magazine. He then tossed the gun under the bed, threw S.E.'s cell phone on the bed, and said, "'That's what you get, [expletive].'" Logan then left in his vehicle.

S.E. was able to reach her phone and called the 911 emergency dispatch service at 6:30 a.m. S.E. reported that she and her brother had been shot by Logan. A patrol sergeant arrived on scene and applied a tourniquet to each of S.E.'s legs. S.E. was transported to a hospital, where she remained for nearly a month.

Meanwhile, law enforcement searched for Logan and his vehicle. They took several measures to locate Logan but were unsuccessful. On May 15, 2023, Logan's vehicle was recovered in a rural area. That evening, after arrangements were made, Logan turned himself in to law enforcement.

### JURY VERDICTS AND SENTENCING

The jury returned verdicts finding Logan guilty of all eight counts. The court accepted the verdicts.

Logan waived his right to physically appear for sentencing.

The court imposed the following sentences of imprisonment: count 1, first degree murder, life to life; count 2, use of a deadly weapon to commit a felony, 40 to 50 years; count 3, use of a deadly weapon to commit a felony, 20 to 40 years; count 4, use of a deadly weapon to commit a felony, 5 to 10 years; count 5, possession of a deadly weapon to commit a felony, 5 to 10 years; count 6, first degree domestic assault, 10 to 20 years; count 7, burglary, 5 to 10 years; and count 8, intentional child abuse with no serious bodily injury, 2 to 3 years. It ordered the sentence in count 1 to be served consecutive to counts 2 through 8; the sentence in count 2 to be served consecutive to count 1 and counts 3 through 8; the sentences in counts 3 and 6 to be served concurrent to each other but consecutive to counts 1, 2, 4, 5, 7, and 8; the sentences in counts 4 and 8 to be served concurrent to each other but consecutive to counts 1 through 3 and counts 5 through 7; and the sentences in counts 5 and 7 to be served concurrent to each other but consecutive to counts 1 through 4 and counts 6 and 8.

Logan filed a timely appeal. Because of the life sentence imposed, the appeal was docketed with this court.[1]

### ASSIGNMENTS OF ERROR

Logan assigns that the court erred in (1) admitting evidence of prior uncharged assaults against S.E. under the inextricably intertwined doctrine, (2) refusing to instruct the jury on

---

[1] See Neb. Rev. Stat. § 24-1106(1) (Cum. Supp. 2024).

self-defense, (3) failing to sequester S.E., and (4) imposing sentences for both first degree murder and burglary.

## STANDARD OF REVIEW

[1,2] An appellate court will review for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under rule 404(2), or under the inextricably intertwined exception to the rule.[2] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[3]

[3] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[4]

[4] The exclusion or sequestration of a witness is within the discretion of the trial court.[5]

[5] Whether two convictions result in multiple punishments for the same offense for double jeopardy purposes presents a question of law, on which an appellate court reaches a conclusion independent of the court below.[6]

[6] Consideration of plain error occurs at the discretion of an appellate court.[7]

## ANALYSIS

### Evidence of Prior Assaults Was Inextricably Intertwined

The bulk of Logan's briefing on appeal focuses on his contention that the court abused its discretion by allowing

---

[2] *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

[3] *State v. Dawn, ante* p. 342, 27 N.W.3d 9 (2025).

[4] *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

[5] *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

[6] *State v. Lewis*, 319 Neb. 847, 25 N.W.3d 421 (2025).

[7] *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023), *cert. denied* ___ U.S. ___, 144 S. Ct. 1073, 218 L. Ed. 2d 249 (2024).

evidence of Logan's prior uncharged assaults on S.E. The district court allowed such evidence, stating that "the prior interactions between [S.E.] and [Logan] and the nature of their relationship are necessary for the prosecution to present a coherent picture of the charged crime." Logan asks that we revisit our jurisprudence on the inextricably intertwined exception to rule 404. We decline to do so.

[7,8] Under rule 404(2), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith.[8] However, rule 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.[9]

[9] We have explained that inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts.[10] Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.[11]

Here, evidence about the nature of Logan and S.E.'s relationship, including Logan's prior assaults on S.E., supplied context for the crimes. The evidence helped explain the deterioration of their relationship from a loving one leading to a child to one filled with vitriol and death threats and culminating in Logan's shooting S.E.'s legs in the presence of their child and killing S.E.'s brother as he came to S.E.'s aid. Because the testimony was inextricably intertwined with the charged crimes,

---

[8] *Id.*

[9] See *id*.

[10] *Id*.

[11] *Id*.

we cannot say that it was clearly untenable for the district court to admit it.

[10] Logan also contends that the evidence should not have been admitted because his prior assaultive behavior toward S.E. had no bearing on the charges that he killed Jordan or that he abused the child. Even if we were inclined to agree with Logan, he is not entitled to any relief because he did not ask the court to limit the jury's consideration of such evidence to the charges relating to S.E. The failure to provide a limiting instruction absent a request is not reversible error.[12]

[11,12] Moreover, even if the district court had erred in admitting evidence of Logan's prior assaultive behavior toward S.E., the error would have been harmless. An error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt.[13] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[14] Here, the error was harmless because Logan admitted shooting S.E., including while she held their child, and admitted shooting Jordan. The only real issue was whether Logan shot Jordan in self-defense. We address his self-defense argument next.

## Self-Defense Instruction
## Not Warranted

[13] Logan argues that the court erred by refusing to give his tendered jury instruction on self-defense. To establish reversible error from a court's refusal to give a requested

---

[12] *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023).

[13] *State v. Torres Aquino*, 318 Neb. 771, 19 N.W.3d 222 (2025).

[14] *Id*.

instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[15]

The State does not contend that the proposed instruction was an incorrect statement of the law; rather, the State asserts that the evidence did not warrant a self-defense instruction. To determine whether the State is correct, we start with our law concerning self-defense.

[14] Justifications for the use of force in self-defense are statutorily defined, and the defendant bears the initial burden to produce evidence which supports a claim of self-defense.[16] Neb. Rev. Stat. § 28-1409(1) (Reissue 2016) provides, in part, that "the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." A subsection addressing the use of deadly force provides:

The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat, nor is it justifiable if:

(a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand

---

[15] *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023).

[16] *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999).

that he abstain from any action which he has no duty to take . . . .[17]

[15-18] A trial court is required to give a self-defense instruction where there is any evidence in support of a legally cognizable theory of self-defense.[18] Only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense.[19] To instruct on self-defense, it is not enough that the defendant subjectively believed in the need to use force for self-protection; the defendant must produce evidence that this subjective belief was also objectively reasonable.[20] Further, if a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense.[21]

Applying this law to the facts of this case demonstrates that a self-defense instruction was not warranted. The undisputed evidence established that Logan, armed with a gun, kicked in the front door of another person's dwelling and entered. By these actions, Logan placed himself in harm's way without justification for doing so. For that reason, the court did not err in refusing to instruct the jury on self-defense.

## No Abuse of Discretion in
## Failing to Sequester S.E.

Logan next argues that he was denied due process and a fair trial when the court lifted its sequestration order as to S.E. He asserts that "it is impossible to know how she may have tailored her testimony in response to what she heard, especially

---

[17] § 28-1409(4).

[18] *State v. Case, supra* note 4.

[19] *State v. Johnson, supra* note 15.

[20] *Id.*

[21] *State v. Case, supra* note 4; *State v. Urbano, supra* note 16.

given the detailed opening statement of the prosecutor which forecasted exactly what she was expected to say."[22]

The record is not entirely clear regarding sequestration of S.E. We assume, without deciding, that the district court expressly allowed S.E. to remain in the courtroom throughout the trial, including during opening statements and witnesses' testimony adduced before S.E. testified. Logan sufficiently objected to S.E.'s presence during opening statements and thereafter until she testified.

[19,20] Generally speaking, a request for sequestration of witnesses is a request that they be excluded from the courtroom until called to testify.[23] Sequestration is based on the belief that not hearing other witnesses' testimony tends to better elicit the truth and promote the ends of justice.[24] As a federal circuit court has explained, "Scrupulous adherence to [the sequestration rule] is particularly necessary in those cases in which the outcome depends on the relative credibility of the parties' witnesses."[25]

[21] Sequestration is governed by a statute that recognizes exceptions, including one applicable here. Neb. Evid. R. 615, Neb. Rev. Stat. § 27-615 (Reissue 2016), provides that at a party's request or sua sponte by the court, "the judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses." Rule 615 provides three exemptions. Under the circumstances of this case, we are concerned with the third, which exempts from exclusion "a person whose presence is shown by a party to be essential to the presentation of his cause."[26] For purposes of rule 615(3), a victim in a criminal case may be qualified as an essential

---

[22] Brief for appellant at 51.

[23] *State v. Trail, supra* note 5.

[24] *State v. Johnson, supra* note 15.

[25] *United States v. Farnham*, 791 F.2d 331, 335 (4th Cir. 1986).

[26] Rule 615(3).

person.[27] Here, because S.E. was Logan's victim, rule 615 permitted the district court to exercise discretion and allow her to remain in the courtroom.

[22] The question thus becomes whether the district court abused its discretion. The denial of a sequestration motion will not be overturned absent evidence of prejudice to the defendant.[28]

To demonstrate prejudice, Logan contends that S.E. "was able to craft her testimony"[29] after hearing a "detailed road map"[30] during opening statements, as well as during the testimony of her father, a 911 communications supervisor, a patrol sergeant, and a detective.

But prior to trial, S.E. had been interviewed by law enforcement and had given a deposition while under oath. If S.E. changed her previous statements to match what she heard during trial, Logan had the opportunity to bring up any discrepancy during cross-examination.

Logan has failed to establish prejudice. Thus, we conclude that the court did not abuse its discretion.

### DOUBLE JEOPARDY ERROR
### IN SENTENCING

The State charged Logan under an alternative theory of both purposeful murder and felony murder, with burglary as the predicate felony. It also charged Logan with burglary. The court convicted and sentenced Logan for both offenses. Logan assigns, and the State agrees, that the imposition of sentences for both first degree murder and burglary subjected Logan to double jeopardy. We also agree.

---

[27] See, *State v. Eynon*, 197 Neb. 734, 250 N.W.2d 658 (1977); *State v. Embree*, 31 Neb. App. 609, 987 N.W.2d 297 (2023).

[28] *State v. Trail, supra* note 5.

[29] Brief for appellant at 51.

[30] *Id*.

[23] Both this court and the U.S. Supreme Court have recognized that the respective Double Jeopardy Clauses of the U.S. and Nebraska Constitutions protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.[31]

[24] In *State v. Nissen*,[32] we determined that where a defendant is alternately charged with both premeditated murder and felony murder and the record is not clear under which theory the jury found the defendant guilty, then the defendant cannot be sentenced for both the murder and the predicate felony for felony murder. That is the situation here. Thus, as we did in *Nissen*, we vacate the sentence on count 7 for burglary. But the burglary conviction will stand.

## Plain Error in Sentencing

The State asserted in its brief, and Logan's counsel forthrightly conceded during oral argument, that the court erred in directing that some of the sentences for use of a deadly weapon convictions be served concurrent to other counts. We agree that the court erred.

The district court ordered that counts 3 and 6 be served concurrent to each other, but consecutive to all other counts. Similarly, it ordered that counts 4 and 8 be served concurrent to each other, but consecutive to all other counts. However, counts 3 and 4 charged use of a deadly weapon to commit a felony in violation of Neb. Rev. Stat. § 28-1205 (Reissue 2016).

[25] Section 28-1205 mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed and concurrent

---

[31] *State v. Lewis, supra* note 6.

[32] *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997).

with no other sentence.[33] Thus, a sentencing court does not have authority to order that sentences for the conviction of use of a deadly weapon to commit a felony run concurrently with the other sentences.[34] And we have found plain error where a court ordered a sentence for use of a weapon to run concurrently to other felony sentences imposed.[35] Here, it was plain error to order counts 3 and 4 to run concurrent to another felony sentence. Because the sentencing error may have affected the other sentences imposed, we vacate the sentences and remand the cause for resentencing.

We are somewhat puzzled by an articulation that a sentence on one count is consecutive to another count and that the sentence on the other count is consecutive to the first count. To the extent that the language merely conveys that the two sentences are not to be served concurrently, there is no harm. But if the order in which the sentences are to be served makes a difference, such an articulation introduces uncertainty.

## CONCLUSION

For the reasons provided above, we conclude the following:

- Because evidence of Logan's prior uncharged assaults on S.E. provided context for his crimes, the court did not abuse its discretion in admitting it as inextricably intertwined evidence.
- Logan was not entitled to an instruction on self-defense, because he unjustifiably placed himself in harm's way.
- The court did not abuse its discretion by not sequestering S.E., one of Logan's victims, and Logan has failed to demonstrate that he suffered any prejudice by S.E.'s presence during the trial.
- Because the State charged Logan alternately with both premeditated murder and felony murder, and it is not clear upon which theory the jury found him guilty, it violates double jeopardy to

---

[33] See *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017).

[34] See *id.*

[35] *Id*.

impose a sentence for both the murder and the predicate felony of burglary.
• The court erred in ordering two sentences for use of a deadly weapon to commit a felony to run concurrently with another sentence.

Accordingly, we affirm all of Logan's convictions but vacate the sentences. We remand the cause to the sentencing court for resentencing on all counts except count 7.

Convictions affirmed, all sentences vacated,
and cause remanded for resentencing.